# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE UNITED STATES VIRGIN ISLANDS
ST. THOMAS/ST. JOHN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

         Plaintiff,

      v.                                   Civil No. 3:10-cv-48

GOVERNMENT OF THE U.S. VIRGIN ISLANDS,
VIRGIN ISLANDS WASTE MANAGEMENT AUTHORITY,
VIRGIN ISLANDS PORT AUTHORITY, and
JOSEPH AND ZULMA HODGE,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# PARTIAL CONSENT DECREE
# WITH GOVERNMENT OF THE U.S. VIRGIN ISLANDS AND
# VIRGIN ISLANDS WASTE MANAGEMENT AUTHORITY
# REGARDING ANGUILLA LANDFILL

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 3 |
| II. | JURISDICTION AND VENUE | 4 |
| III. | APPLICABILITY | 5 |
| IV. | DEFINITIONS | 5 |
| V. | CIVIL PENALTY | 8 |
| VI. | CAA COMPLIANCE REQUIREMENTS | 9 |
| VII. | RCRA COMPLIANCE REQUIREMENTS | 13 |
| VIII. | SCRAP TIRE REMOVAL | 17 |
| IX. | SCRAP METAL | 18 |
| X. | WASTE DIVERSION | 19 |
| XI. | DELIVERABLES | 19 |
| XII. | REPORTING AND RECORDKEEPING | 20 |
| XIII. | PERMITS | 26 |
| XIV. | FINANCING | 26 |
| XV. | STIPULATED PENALTIES | 28 |
| XVI. | FORCE MAJEURE | 32 |
| XVII. | DISPUTE RESOLUTION | 33 |
| XVIII. | INFORMATION COLLECTION AND RETENTION | 35 |
| XIX. | EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS | 36 |
| XX. | COSTS | 37 |
| XXI. | NOTICES | 38 |
| XXII. | APPENDIX | 39 |
| XXIII. | EFFECTIVE DATE | 39 |
| XXIV. | RETENTION OF JURISDICTION | 40 |
| XXV. | MODIFICATION | 40 |
| XXVI. | TERMINATION | 40 |
| XXVII. | PUBLIC PARTICIPATION | 41 |
| XXVIII. | SIGNATORIES/SERVICE | 42 |
| XXIX. | INTEGRATION | 42 |
| XXX. | FINAL JUDGMENT | 42 |

I.      INTRODUCTION

A.    Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), filed a complaint in this action alleging that Defendants Government of the U.S. Virgin Islands ("GVI") and Virgin Islands Waste Management Authority ("WMA") violated Sections 111(d), 112, 114 and 503 of the Clean Air Act as amended (hereinafter "CAA"), 42 U.S.C. § 7401, *et seq.*, and Section 7003(a) of the Solid Waste Disposal Act, as amended by various laws including the Resource Conservation and Recovery Act (hereinafter collectively referred to as "RCRA"), 42 U.S.C. § 6901, *et seq.,* at the Bovoni Municipal Solid Waste Landfill ("Bovoni") on the island of St. Thomas in the U.S. Virgin Islands and that GVI, WMA and the Virgin Islands Port Authority ("VIPA") violated Sections 111(d), 112, 114 and 503 of the CAA and Section 7003(a) of RCRA at the Anguilla Municipal Solid Waste Landfill ("Anguilla") on the island of St. Croix in the U.S. Virgin Islands. The United States later filed an amended complaint adding a claim regarding the removal of scrap tires at Bovoni.

B.    A partial consent decree that addresses EPA's claims against GVI and WMA regarding the Bovoni landfill was lodged with the Court and awaits the Court's approval.

C.    This Partial Consent Decree addresses EPA's claims against GVI and WMA regarding Anguilla. It does not address the claims against VIPA, Joseph Hodge, and Zulma Hodge.

D.    EPA's regulations issued under the CAA require that each landfill that has a capacity greater than a certain threshold must submit annual reports to EPA regarding emissions of non-methane organic compounds ("NMOCs"); that if any NMOC report shows that the annual emissions of these landfill gases exceed a specified threshold quantity, the landfill must design, construct, and operate, according to certain deadlines, a gas collection and control system ("GCCS") that captures and combusts gases generated within the landfill. Effective January 2004, the CAA regulations also require each such landfill to develop and implement a start-up, shutdown and malfunction ("SSM") plan for the GCCS.

E.    EPA made findings that Anguilla was being operated in a manner that may present an "imminent and substantial endangerment to health and the environment" and, pursuant to RCRA Section 7003(a), issued an administrative order on consent ("Anguilla RCRA AOC") that required that GVI, VIPA, and WMA, *inter alia*, pursuant to an approved schedule, award contracts by August 2006 to install a ground water monitoring system and to implement a storm water pollution prevention plan at Anguilla by June 2008.

F.    VIPA is the owner of the land underlying Anguilla. GVI is the former operator of Anguilla. WMA is the current operator of Anguilla. Plaintiff alleged that the GVI, VIPA, and WMA failed to timely submit annual NMOC reports, failed to timely install the GCCS, and failed to timely comply with the Anguilla RCRA AOC. Plaintiff seeks civil penalties and injunctive relief for the GVI's, VIPA's, and WMA's alleged failures to

comply with the CAA and its regulations and stipulated penalties and injunctive relief for their alleged failures to comply with the Anguilla RCRA AOC.

G.   In their answer to the Complaint, GVI, VIPA and WMA denied the allegations and EPA's claims for relief and pled a number of affirmative defenses.  By entering into this Consent Decree the VI Defendants do not waive or concede their affirmative defenses and denials of the United States' allegations.

H.   To the south of, and adjacent to, Anguilla there is an existing peninsula that was previously created, and that extends approximately 1,100 feet into the Caribbean Sea. GVI created a scrap metal disposal area on the peninsula that, by 2005, occupied about 12 acres ("Scrap Metal Area").  The Scrap Metal Area contained scrap metal, automobiles, home appliances and metal objects, among other things.  In September 2005, EPA made findings that the conditions at the Scrap Metal Area may present an "imminent and substantial endangerment to health or the environment" and, pursuant to RCRA Section 7003(a), issued an administrative order on consent ("Scrap Metal AOC") requiring GVI and WMA, *inter alia*, (1) to remove all scrap metal from the Scrap Metal Area; (2) to implement a program to restore the Scrap Metal Area; and (3) to implement a program regarding future management of scrap metal.  GVI and WMA have removed the majority of the scrap metal from the Scrap Metal Area.  In June 2011, WMA submitted a proposed schedule for implementing the remaining requirements under the Scrap Metal AOC, which EPA has approved.

I.   The GVI, VIPA and WMA have represented that they are subject to certain financial limitations regarding the funding of the compliance measures required by the CAA, RCRA, the implementing regulations for both statutes, the Scrap Metal AOC, and the Anguilla RCRA AOC, including the Territory's constitutional debt limit pursuant to the Revised Organic Act of the Virgin Islands, 48 U.S.C. §§ 1541-1644 ("Revised Organic Act").

J.   The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties regarding Anguilla, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.   JURISDICTION AND VENUE

1.   This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and Section 7003(b) of RCRA, 42 U.S.C. § 6973(b), and over the parties.  Venue lies in this

District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b) and Section 6973(b) of RCRA, 42 U.S.C. § 6973(b) and 28 U.S.C. §§ 1391(b) and 1395(a) because the violations alleged in the Complaint are alleged to have occurred in St. Thomas and St. Croix and Defendants each conduct business in this District.  For purposes of this Decree, or any action to enforce this Decree, Defendants consent to the Court's jurisdiction over this Decree and any such action and over Defendants and consent to venue in this judicial district.

2.      Notice of commencement of this action has been given to the Government of the Virgin Islands.

III.      APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States and upon Defendants and any successors, assigns, or other entities or persons otherwise bound by law.

4.      No transfer of ownership or operation of the Landfill, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendants of their obligation to ensure that the terms of the Decree are implemented.  At least 30 days prior to such transfer, Defendants shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region 2, the United States Attorney for the District of the Virgin Islands and the United States Department of Justice, in accordance with Section XXI (Notices).

5.      Defendants shall provide a copy of the Consent Decree to all officers, supervisors and managers whose duties include work required under the Consent Decree, and a summary of applicable requirements of the Consent Decree to all employees and agents whose duties include work required under the Consent Decree.

6.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

IV.      DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the CAA or in RCRA or regulations promulgated pursuant to the CAA or RCRA shall have the meanings assigned to them in the statutes or such regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the  following definitions shall apply:

"Anguilla RCRA AOC" shall mean the Administrative Order on Consent entered in *In the Matter of Anguilla Municipal Solid Waste Landfill*, St. Croix, U.S.V.I., EPA Docket No. RCRA-02-2001-7302.

"Anguilla Scrap Tire Area" shall mean the area in which GVI and WMA disposed of tires near the former abattoir at the Landfill;

"Approved Closure Plan" shall mean the Closure Plan upon its approval by EPA as described in Paragraphs 20.a and 20.c, or any superseding closure plan as described in Paragraph 20.b, that is approved by EPA and in effect as provided in Paragraph 20.c;

"Bovoni Consent Decree" shall mean the partial consent decree entered in this matter regarding the Bovoni Landfill;

"Business day" shall mean any day Monday through Friday, except for any federal or Territory holiday;

"CAA" shall mean the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*;

"Closure" shall mean the point in time when WMA has permanently ceased depositing solid waste at the Landfill, WMA has completed the requirements of the Approved Closure Plan and the Closure Schedule, and WMA has achieved the closure criteria set forth in 40 C.F.R. § 258.60;

"Closure Work" shall mean all work, tasks, and other steps to be implemented to achieve "Closure" in accordance with the Decree, the Approved Closure Plan, the Closure Schedule, and the closure criteria set forth in 40 C.F.R. § 258.60;

"Closure Schedule" shall mean the schedule for Closure Work set forth in Appendix A, lines 9 through 27, including any modifications thereto under Paragraph 20.e, 53.e, or 53.f, and that is in effect as provided in Paragraph 20.e, 53.e, or 53.f;

"CMS" shall mean continuous monitoring system, *e.g.*, the total equipment, required under this Decree, used to sample, to analyze, and to provide a permanent record of emissions or process parameters regarding the Landfill;

"Complaint" shall mean the amended complaint filed by the United States in this action;

"Consent Decree" or "Decree" shall mean this consent decree, entitled "Partial Consent Decree Regarding Anguilla Landfill," and all appendices attached hereto;

"day" shall mean a calendar day unless expressly stated to be a Business day. In computing any period of time under this Consent Decree, where the last day would fall

on a Saturday, Sunday, or federal or Territory holiday, the period shall run until the close of business of the next Business day;

"Defendants" shall mean the GVI and WMA;

"DPNR" shall mean the Virgin Islands Department of Planning and Natural Resources and any of its successor departments or agencies;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXIII;

"Federal Plan" shall mean the Federal Plan Requirements for MSW Landfills That Commenced Construction Prior to May 30, 1991 and Have Not Been Modified or Reconstructed Since May 30, 1991, 40 C.F.R. Part 62, Subpart GGG, 40 C.F.R. §§ 62.14350-14356;

"GCCS" shall mean gas collection and control system;

"GVI" shall mean the Government of the U.S. Virgin Islands;

"HAP" or "Hazardous air pollutant" means any air pollutant listed in or pursuant to Section 112(b) of the CAA;

"Landfill" shall mean the Anguilla Municipal Solid Waste Landfill located on the island of St. Croix in the U.S. Virgin Islands;

"Landfill MACT" shall mean the National Emission Standards for Hazardous Air Pollutants: Municipal Solid Waste Landfills, 40 C.F.R. Part 63, Subpart AAAA, 40 C.F.R. §§ 63.1930-63.1990, which establish national emission standards for hazardous air pollutants for new and existing MSW landfills;

"Landfill NSPS" shall mean the "New Source Performance Standards for Municipal Solid Waste Landfills," 40 C.F.R. Part 60, Subpart WWW, 40 C.F.R. §§ 60.750-60.759, which apply to landfills constructed, reconstructed or modified after May 30, 1991;

For purposes of the CAA requirements "Municipal Solid Waste Landfill" shall have the meaning of that term as set forth in 40 C.F.R. § 63.1990, and for purposes of RCRA requirements it shall have the meaning of that term as set forth in 40 C.F.R. § 258.2;

"NMOC" shall mean Non Methane Organic Compounds, as measured according to 40 C.F.R. § 60.754;

"Paragraph" shall mean a portion of this Decree identified by an arabic numeral;

"Parties" shall mean the United States and Defendants;

"RCRA" shall mean the Solid Waste Disposal Act, as amended by various laws including the Resource Conservation and Recovery Act and the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. § 6901, *et seq*.;

"Scrap Metal Area" shall mean the area in which GVI and WMA disposed of scrap metal on the peninsula south of the Landfill;

"Scrap Metal AOC" shall mean the Administrative Order on Consent entered in *In the Matter of Scrap Disposal Open Dump Area*, St. Croix, U.S.V.I., EPA Docket No. RCRA-02-2005-7302;

"Section" shall mean a portion of this Decree identified by a roman numeral;

"Significant Groundwater Corrective Action" shall mean work, if any, required to implement a selected remedy of groundwater corrective action pursuant to 40 C.F.R. § 256.56-58 that involves a large and non-recurring capital expenditure that cannot be met through annual operating budgets;

"SSM" shall mean startup, shutdown and malfunction;

"Sufficient extraction rate" is an extraction rate sufficient to maintain a negative pressure at all wellheads in the collection system as specified in 40 C.F.R. § 60.753(b) without causing air infiltration, including any wellheads connected to the system as a result of expansion or excess surface emissions, for the life of the blower, as defined in 40 C.F.R. § 60.751;

"Territory" shall mean the territory of the United States Virgin Islands;

"WMA" shall mean the Virgin Islands Waste Management Authority and any successor agency, department, or authority; and

"United States" shall mean the United States of America, acting on behalf of EPA.

V.        CIVIL PENALTY

8.    Civil Penalty Amounts.

     a.      Defendants shall jointly pay $50,000 as a civil penalty.  Payment of the principal amount shall be made in four equal annual installments of $12,500.  The first

installment payment is due within 30 days after the Effective Date. The subsequent annual installment payments are due on the anniversary of the Effective Date of the Partial Bovoni Consent Decree. Each such subsequent installment payment shall also include an additional sum for interest at the rate specified in 28 U.S.C. § 1961 as of the Effective Date of the Partial Bovoni Consent Decree accrued on the unpaid portion of the principal amount calculated from that Effective Date until the date of the payment. The Financial Litigation Unit ("FLU") of the United States Attorney's Office for the District of the Virgin Islands shall send a calculation of the interest due for each payment to Defendants with the payment instructions as provided in Paragraph 9. Defendants may pay any installment payment prior to the due date, but must contact the FLU in advance for a determination regarding the amount of Interest to be included with the payment. In the event any installment payment includes an overpayment, the amount of the overpayment shall be applied to the remaining principal.

9. Defendants shall pay the civil penalties due by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to Defendants, following lodging of the Consent Decree, by the FLU of the U.S. Attorney's Office for the District of the Virgin Islands. At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree, and shall reference the civil action number and DOJ case number 90-5-2-1-08776, to the United States in accordance with Section XXI (Notices), by email to acctsreceivable.CINWD@epa.gov; and by mail to: EPA Cincinnati Finance Office, 26 West Martin Luther King Drive, Attn: Finance, Mail Code: NWD, Cincinnati, Ohio 45268.

VI.    CAA COMPLIANCE REQUIREMENTS

10. WMA shall comply, under the timetable attached as Appendix A, with the Federal Plan and with the Landfill MACT, which require compliance in accordance with the Landfill NSPS.

11. GCCS Design and Installation

a. WMA shall, by the deadline specified in Appendix A, submit for EPA's approval a GCCS design plan. The plan shall conform to the Closure Plan, and shall comply with the Federal Plan and the Landfill MACT.

b. The GCCS shall be installed: (i) in phases in accordance with Appendix A; (ii) by the deadlines specified in Appendix A; and (iii) in accordance with the approved GCCS design plan.

c.     WMA may propose revisions to the GCCS as necessary to reflect changed circumstances or conditions at the Landfill. Any proposed revised design plan shall include a timetable for completion of such revisions. The revised designs shall be submitted to EPA and approved and implemented in accordance with Section XI (Deliverables).

d.     WMA may implement further changes to the GCCS only if it submits a revised design plan and obtains EPA's prior written approval for such changes, provided, however, that WMA may implement non-material changes to the GCCS upon EPA's prior written approval without a design plan.

12.     For purposes of this Section, any reference to "control system" shall be deemed to refer to a flare, a gas-to-energy plant or other approved control or treatment system and any reference to a "temporary control system" shall be deemed to refer to any portable combustion device that uses landfill gas as its primary fuel and meets the requirements of the Federal Plan and the Landfill MACT but is intended to be used until the GCCS is completely installed and operational.

13.     <u>Initial Performance Test of GCCS</u>. WMA shall, by the deadline specified in Appendix A, submit for EPA's approval a proposed protocol for performance testing of the control system. WMA shall, by the deadline specified in Appendix A or within 90 days after EPA's approval of the protocol, whichever is later, complete the initial performance test of the control system. WMA shall perform the initial performance test of the control system using the test methods specified in 40 C.F.R. § 60.754(d) and (e), the test procedures specified in 40 C.F.R. § 60.754(b), and in accordance with the EPA-approved protocol. WMA shall submit to EPA an initial performance test report within 45 days after completion of the initial performance test. The report shall satisfy the specifications of 40 C.F.R. §§ 60.8, 60.757 and 60.758.

14.     <u>Monitoring, Operation and Maintenance of GCCS</u>. Commencing upon completion of construction of the GCCS control system, and until these obligations are superseded by the effective GCCS O&M Plan (as provided in Paragraph 15), WMA shall operate each completed phase of the GCCS as specified in 40 C.F.R. §§ 60.30c-60.36c, 60.753, 60.755 and 60.756. To comply with these operational standards WMA shall, among other things:

a.     Operate the GCCS, as specified in 40 C.F.R. § 60.753(b), with negative pressure at each wellhead except under the following conditions:

(1)     A fire or increased well temperature. WMA shall record instances when positive pressure occurs in efforts to avoid a fire. These records shall be submitted with the annual reports as specified in 40 C.F.R. § 60.757(f)(1);

(2)     Where WMA uses a geomembrane or other acceptable synthetic cover at the Landfill. To use this exception, WMA shall develop acceptable

pressure limits and shall submit them as part of the GCCS O&M Plan to be submitted under Paragraph 15;

(3)     The well has been decommissioned. A well may experience a static positive pressure after shut down to accommodate for declining flows. Decommissioning of wells is subject to approval by EPA.

b.     Monitor and operate each interior wellhead of the GCCS, as specified in 40 C.F.R. §§ 60.753(c) and 60.756(a)(2)-(3), with a landfill gas temperature less than 55°C and with either a nitrogen level less than 20 percent or an oxygen level less than five percent. WMA shall obtain EPA approval prior to establishing a higher operating temperature, nitrogen, or oxygen value for any individual wellhead. Any such request for a higher operating value must include a demonstration, with supporting data, showing that the elevated parameter will not cause an increased risk of fire or significantly inhibit anaerobic decomposition by killing methanogens.

c.     Monitor and operate the GCCS, as specified in 40 C.F.R. §§ 60.753(d), 60.755(c)-(d), and 60.756(f), so that the methane concentration is less than 500 parts per million above background at the surface of the Landfill. To determine if this level is exceeded WMA shall conduct surface testing as specified in 40 C.F.R. § 60.753(d).

d.     Operate the GCCS, as specified in 40 C.F.R. § 60.753(e), such that all collected gases are vented to the control system, or to a temporary control system until the permanent control system becomes operational. In the event the control system becomes inoperable, WMA shall shut down the gas mover system and close the main header valve, in the gas collection system to the control system, within one hour. Provided that no component of the GCCS that includes a valve otherwise allows NMOCs to be emitted to the atmosphere while the collection system or control system is inoperable, this procedure shall satisfy the specifications of 40 C.F.R. § 60.752(b)(2)(iii).

e.     Monitor and operate the control system, as specified in 40 C.F.R. §§ 60.752(b)(2)(iii), 60.753(f), and 60.756(b), at all times when the collected gas is routed to the control system.

f.     As specified in 40 C.F.R. § 60.753(g), if monitoring demonstrates that the operational requirements in this paragraph are not met, take corrective action as specified in 40 C.F.R. § 60.755(a)(3) through (5) or 40 C.F.R. § 60.755(c), including to maintain and repair the cover, to make adjustments to the vacuum of adjacent wells, to upgrade equipment, and/or to install new wells.

15.   O&M Plan.

a. WMA shall, by the deadline specified in Appendix A, submit a proposed GCCS Operation and Maintenance ("O&M") Plan for EPA's review and comment. The proposed GCCS O&M Plan shall include all the obligations specified in 40 C.F.R. §§ 60.752 through 60.756, including the obligations specified in Paragraph 14, and shall provide for WMA to operate the control system:

(1) At all times when collected gas is routed to the control system, as specified in 40 C.F.R. § 60.752(b)(2)(iii) and 40 C.F.R. § 60.753(f);

(2) To reduce NMOC as specified in 40 C.F.R. § 60.752(b)(2)(iii)(B);

(3) Within the parameter ranges established during the initial or most recent performance test. The operating parameters to be monitored shall be those specified in 40 C.F.R. § 60.756.

b. WMA shall revise its proposed GCCS O&M Plan taking into consideration EPA's comments. WMA shall notify EPA of the revised GCCS O&M Plan. Upon such notification, the revised GCCS O&M Plan shall be effective and shall supersede Paragraph 14. WMA may modify the O&M plan from time to time. Any such modification shall include the obligations described in Paragraph 15.a. WMA shall take into consideration EPA's comments in accordance with the procedures of this Paragraph 15.b. WMA shall operate the GCCS at all times and report to EPA regarding such operations in accordance with the effective GCCS O&M Plan, including any modifications.

16. Startup, Shutdown and Malfunction Events.

a. WMA shall, by the deadline specified in Appendix A, submit a proposed SSM Plan for EPA's review and comment. The proposed SSM Plan shall include all the obligations specified in 40 C.F.R. §§ 63.6, as specified in Table 1 of the Landfill MACT. WMA shall revise its proposed SSM O&M Plan taking into consideration EPA's comments, and shall notify EPA of the issuance of the revised SSM plan.

b. EPA may, from time to time, request that WMA modify the SSM Plan to comply with 40 C.F.R. § 63.6, as specified in Table 1 of the Landfill MACT. WMA shall submit a proposed modified SSM Plan for EPA's review and comment. WMA shall revise the proposed modified SSM plan taking into consideration EPA's comments, and shall notify EPA of the issuance of the revised SSM plan.

c. WMA may revise the SSM Plan as necessary to satisfy the requirements of this Consent Decree or to reflect changes in equipment or procedures regarding operation of the GCCS. WMA shall notify EPA of any such revision to the SSM Plan. If WMA makes a revision to the SSM Plan that alters the definition of what constitutes an SSM event, or the scope of the activities to address SSM events, or modifies the applicability of any emission limit, work practice requirement, or

other requirement in a standard established under 40 C.F.R. Part 63, WMA shall notify EPA and the applicable permitting authority, and the revised SSM Plan shall be effective upon such notice.

d. If the SSM Plan fails to address or inadequately addresses an event that meets the characteristics of a malfunction but was not included in the SSM Plan at the time WMA developed the SSM Plan, WMA shall revise the SSM Plan within 45 days after the event occurs to include: (a) detailed procedures for operating and maintaining the GCCS during similar malfunction events, and (b) a program of corrective action for similar malfunctions of process equipment, air pollution control equipment and/or monitoring equipment.

e. When WMA notifies EPA of any revised SSM plan in accordance with this Paragraph, that revised SSM plan shall become effective and shall supersede any prior SSM Plan that was in effect.  WMA shall operate the GCCS at all times. During periods of SSM, WMA shall operate the GCCS in accordance with the SSM Plan that is in effect.

17. WMA's obligations under this Section are enforceable under this Decree until WMA demonstrates continuous compliance with all the CAA provisions of this Decree, for a period of two years, including, but not limited to, submission of a complete Title V permit application that includes all the CAA provisions of Paragraphs 10 and 38-40, including those pertaining to the control system, as applicable requirements to be included in the Title V permit.

## VII. RCRA COMPLIANCE REQUIREMENTS

18. <u>Pre-Closure Care</u>.  Commencing upon the Effective Date or as otherwise specified in Appendix A, and continuing until Closure, WMA shall operate the Landfill in accordance with the Decree and the federal municipal solid waste landfill operating criteria set forth at 40 C.F.R. §§ 258.20-.29, including:

a. WMA shall implement and maintain a program for detecting and preventing the disposal of regulated hazardous wastes as provided in 40 C.F.R. § 258.20;

b. WMA shall apply adequate cover material as provided in 40 C.F.R. § 258.21;

c. WMA shall control disease vectors as provided in 40 C.F.R. § 258.22;

d. WMA shall control explosive gases as provided in 40 C.F.R. § 258.23;

e. WMA shall ensure that no open burning of solid waste occurs as provided in 40 C.F.R. § 258.24;

f. WMA shall control access as provided in 40 C.F.R. § 258.25;

g.     WMA shall control run-on and run-off as provided in 40 C.F.R. § 258.26;

h.     WMA shall ensure that the Landfill does not cause discharges of pollutants into waters of the United States that violate CWA requirements, as provided in 40 C.F.R. § 258.27;

i.     WMA shall perform a visual survey to determine the extent of leachate, if any, emerging from the surface of the Landfill at its perimeter, and shall submit a report of its findings and a proposal to control any significant leachate identified; and

j.     WMA shall ensure that bulk or non-containerized liquid wastes are not placed in the Landfill except as provided in 40 C.F.R. § 258.28.

19.     Groundwater Monitoring and Corrective Action

a.     WMA shall, by the deadline specified in Appendix A, submit for EPA's approval a groundwater monitoring system design plan.  This design plan shall be consistent with 40 C.F.R.  § 258.51.

b.     WMA shall install the groundwater monitoring system: (i) in phases in accordance with Appendix A; (ii) by the deadlines specified in Appendix A; and (iii) in accordance with the EPA-approved groundwater monitoring system design plan.

c.     WMA shall, upon completion of each phase of installation of the groundwater monitoring system, implement a program for groundwater monitoring, as provided in 40 C.F.R. §§ 258.53-.55.  WMA may seek EPA's approval, for purposes of this Decree only, for WMA to conduct monitoring less frequently than, or conduct monitoring of fewer parameters than, is provided under 40 C.F.R. § 258.54.

d.     WMA shall, by the deadline specified in Appendix A, perform an assessment for groundwater corrective action, and shall select a remedy and implement the remedy if required by and in accordance with  40 C.F.R. §§ 258.56-.58.  If required to submit a groundwater corrective action plan, WMA shall submit a draft plan to EPA for its comments, and shall take EPA's comments into consideration in developing WMA's final groundwater corrective action plan.  If the Territory is not designated as an "approved State" for purposes of 40 C.F.R. §§ 258.56-.58, then EPA may act in the capacity of the "approved State" for the purpose of facilitating the development and implementation of WMA's groundwater corrective action plan, until such time as the Territory is designated as an "approved State" for purposes of 40 C.F.R. §§ 258.56-.57.  If the groundwater corrective action plan involves significant capital expenditure, then

the schedule for implementing such action shall be subject to Section XIV (Financing).

20. Closure Plan and Schedule

    a. <u>Closure Plan</u>. WMA shall, by the deadline specified in Appendix A, submit for EPA's approval a closure plan for the Landfill ("Closure Plan").

    b. <u>Further Revisions to Closure Plan</u>. WMA may propose revisions to the Closure Plan or any later proposed or approved closure plan as necessary to reflect changed circumstances or conditions at the Landfill. In that event, it shall submit the proposed revised closure plan to EPA for its approval as soon as practicable.

    c. <u>Approval of Closure Plans</u>. EPA shall endeavor to notify WMA in writing of EPA's approval of the Closure Plan and any subsequent proposed closure plan, including any conditions of such approval, within 45 days. The Closure Plan and any subsequent proposed closure plan, upon EPA's approval, with or without conditions, shall become effective, shall supersede all prior closure plans, and shall be deemed to be the "Approved Closure Plan" in effect for purposes of the Decree.

    d. <u>Pre-Final/Final Design, Plans and Specifications</u>. If WMA prepares additional drawings, plans or specifications based upon the Approved Closure Plan, WMA shall submit such drawings, plans and specification to EPA for its review and comment. EPA shall expedite its review of, and provide comments, if any, on such drawings, plans or specifications, and shall endeavor to provide its comments to WMA in a timely fashion so as not to interfere with the award of construction contracts regarding closure.

    e. <u>Modification of Closure Schedule</u>. WMA may, after consulting with the EPA RCRA and Air branches, make a determination that the physical contours and slopes in the eastern portion of the Landfill will reach their approved limits at a different date than the deadline to permanently cease accepting waste set forth in Appendix A. In that event, WMA shall establish, after consulting with EPA, new deadlines to permanently cease accepting waste at the Landfill (line 23), to install a GCCS in the eastern portion (line 24), to complete modifications to the entire GCCS (line 25), to complete interim cover with slope stabilization and stormwater control as required in the top and eastern portions (line 26), and to complete Closure (i.e., complete stormwater control measures, fill and grade and install cap and cover over entire landfill area) (line 27). WMA shall notify EPA of the new deadlines and shall prepare a modified Closure Schedule. The modified Closure Schedule shall supersede all prior Closure Schedules, and shall be deemed to be the "Closure Schedule" in effect for purposes of the Decree.

The modified Closure Schedule shall constitute a minor modification for purposes of Paragraph 100.

21.     Closure.  WMA shall implement the Closure Work: (a) in the phases described in Appendix A; (b) by the deadlines specified in Appendix A; (c) in accordance with the Approved Closure Plan; and (d) in accordance with the closure criteria set forth in 40 C.F.R. § 258.60.  WMA shall bid and award contracts so as to ensure completion of each phase of the Closure Work.  WMA shall permanently cease accepting waste at the Landfill by the deadline specified in Appendix A.

22.     If a waste-to-energy (WTE) facility is constructed in the Territory, or if WMA elects to transport waste to a WTE facility outside the Territory, WMA may submit for the approval of EPA's Air and RCRA branches a plan to remove waste from the Landfill and transfer such waste to such facility(ies).  WMA's submittal shall include: (i) a schedule for the waste removal; (ii) an explanation of the method for the waste removal, (iii) a description of the expected contours of the Landfill and an estimate of the volume of waste in the Landfill following the waste removal; (iv) a description of the anticipated adverse effects of the waste removal on the GCCS, the groundwater monitoring wells, the Landfill cover and the stormwater controls and of actions to be performed to minimize such adverse effects; (v) a description of actions to be performed to maintain compliance, during and after the waste removal, with this Consent Decree and the landfill regulations promulgated under the CAA and RCRA; and (vi) other information that EPA may request.  WMA shall implement the waste removal in accordance with such plan upon EPA's approval.  If WMA commences the waste removal on or after the date upon which WMA is required to cease accepting waste at the Landfill, as specified in Appendix A, line 23, WMA may not accept additional waste at the Landfill following completion of the waste removal.

23.     Certifications of Completion of Closure.  WMA shall, upon completion of each phase of the Closure Work, submit a certification to EPA that the work under that phase has been completed in accordance with the Approved Closure Plan.  Each certification shall be signed by an official of WMA and shall contain the form of certification set forth in Paragraph 47.  If EPA determines that the work has not been completed in accordance with the Approved Closure Plan, EPA may require that WMA implement corrections to the work, and WMA shall promptly implement such corrections.

24.     Post-Closure Care.  After Closure, WMA shall (a) conduct post-closure care at the Landfill in accordance with the RCRA regulatory requirements set forth at 40 C.F.R. § 258.61; and (b) shall continue to maintain and operate the GCCS in accordance with the Federal Plan and the Landfill MACT, and as specified in 40 C.F.R. §§ 60.753, 60.756, and 60.757.

## VIII. SCRAP TIRE REMOVAL

25. WMA agrees to the inclusion of scrap tire removal requirements in this Consent Decree. WMA shall, by the deadline specified in Appendix A, remove all scrap tires from the Anguilla Scrap Tire Area. These scrap tires shall be transported outside the Territory in accordance with applicable transport rules and management requirements of the receiving jurisdiction, or used in accordance with the Beneficial Reuse Plan under Paragraph 27. The parties may agree to extend these deadlines to the extent that additional time is needed to negotiate or re-negotiate terms or conditions of the removal contract(s).

26. WMA shall either: (a) relocate, by the deadline specified in Appendix A, the scrap tires a minimum of 50 feet from the main landfill access road, or, (b) from the deadline specified in Appendix A until the tire removal is complete, maintain an alternative access to the portion of the Landfill south of the Scrap Tire Area for landfill personnel and fire-fighting equipment, provided that the scrap tires are at least 50 feet from the alternative access road. The alternative access road shall be consistent with the specifications for fire department access roads under the National Fire Protection Administration, Uniform Fire Code, Chapter 18.

27. Beneficial Reuse Plan. At WMA's sole option, WMA may use all or some of the scrap tires that it removes from Anguilla for an alternative use, other than for energy recovery, subject to the following:

   a. The alternative use shall not extend the time specified in Paragraph 25 for removal of the scrap tires from the Anguilla Scrap Tire Area.

   b. Pending the alternative use, the scrap tires shall be stored in accordance with the Uniform Fire Code of the National Fire Protection Association ("NFPA"), including fire safety standards for storage of tires. The fire safety standards include site selection, emergency planning, pile dimensions, pile separation, fire equipment, and available water supply. At EPA's request, WMA shall supply information on the location of any storage and other information pertaining to the storage conditions and requirements.

   c. Pending the alternative use, WMA shall comply with all applicable Virgin Islands Fire Service requirements.

28. WMA shall, for the Anguilla Scrap Tire Area and any areas where the scrap tires are stored pending beneficial reuse under Paragraph 27, implement mosquito control measures in accordance with the requirements of the Virgin Islands Department of Health until all tires have been removed.

29. Upon written request from EPA, WMA shall provide written progress reports to EPA, including photographs, on the scrap tire removal from the Anguilla Scrap Tire Area, as applicable.

30. Within 30 days of completing the removal of scrap tires from the Anguilla Scrap Tire Area, WMA shall provide documentation, including photographs, to EPA demonstrating that the scrap tires have been removed from the Anguilla Scrap Tire Area, and disposed of or used in accordance with this Consent Decree.

31. <u>Future Scrap Tire Management</u>.  In the future, accumulation and management of scrap tires by Defendants in the Territory shall be in conformity with applicable Territory laws and regulations, and applicable provisions of the Uniform Fire Code of the NFPA, including fire safety standards for storage of tires.

## IX.    SCRAP METAL

32. WMA agrees to the inclusion of scrap metal removal requirements in this Consent Decree.  WMA shall, by the deadline specified in Appendix A, remove all scrap metal from the Scrap Metal Area.  Within 30 days of completing the removal of scrap metal from the Scrap Metal Area, WMA shall provide documentation, including photographs, to EPA documenting that the scrap metal has been removed from the Scrap Metal Area.

33. <u>Remediation of Scrap Metal Area</u>.  WMA shall:

    a. submit, by the deadline specified in Appendix A, for EPA's approval, a plan for an investigation of the nature and extent of contamination in the Scrap Metal Area;

    b. perform an investigation, in accordance with the EPA-approved plan, of the nature and extent of contamination in the Scrap Metal Area;

    c. if the results of the investigation warrant remediation of contamination in the Scrap Metal Area, submit for EPA's approval a plan for such remediation; and

    d. complete such remediation, by the deadline specified in Appendix A, of any contamination in the Scrap Metal Area, in accordance with the EPA-approved plan.

34. <u>Scrap Metal Management Facility</u>.  WMA shall, by the deadline specified in Appendix A, design, build and commence operation of a scrap metal management facility on St. Croix.

35. The parties may agree to extend the deadlines applicable to this Section to the extent that additional time is needed to negotiate or re-negotiate terms or conditions of contract(s) regarding scrap metal removal, the investigation and remediation of the

Scrap Metal Area, and the construction and commencement of operation of the scrap metal management facility.

## X.     WASTE DIVERSION

36.     The initial Waste Diversion Program ("WD Program") required to be submitted to EPA pursuant to the Bovoni Partial Consent Decree, which is pending approval by this Court, shall include provisions regarding the Anguilla Landfill and provisions regarding the education of the public on St. Croix.  The initial WD Program shall cover the Anguilla Landfill to the same extent that it covers the Bovoni Landfill and shall apply to the public on St. Croix to the same extent that it applies to the public on St. Thomas.

## XI.     DELIVERABLES

37.     <u>Approval/Acceptance of Deliverables</u>.  After review of any plan, report, design, or other item that is required to be submitted for EPA approval pursuant to this Consent Decree, EPA shall in writing: (i) approve or accept the submission; (ii) approve or accept the submission upon specified conditions; (iii) approve or accept part of the submission and disapprove the remainder; or (iv) disapprove the submission.

a.     If the submission is approved or accepted, WMA shall take all actions required by the plan, report, design or other document, in accordance with the schedules and requirements of the plan, report, design or other document, as approved or accepted by EPA.  If the submission is conditionally approved or accepted or approved or accepted only in part, WMA shall, upon written direction from EPA, take all actions required by the approved or accepted plan, report, design or other item that EPA determines are technically severable from any disapproved portions.

b.     If the submission is disapproved in whole or in part, WMA shall, within 30 days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, design or other item, or disapproved portion thereof, for approval or acceptance.  If the resubmission is approved or accepted in whole or in part, WMA shall proceed in accordance with the preceding subparagraph.

c.     Any stipulated penalties applicable to an original submission, as provided in Section XV, shall accrue during the 30 day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part,  provided that if the original submission was so deficient as to constitute a material breach of WMA's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

d.    If a resubmitted plan, report, design, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require WMA to correct any deficiencies, in accordance with the preceding Paragraphs, subject to WMA's right to invoke Dispute Resolution and the right of EPA to impose stipulated penalties as provided in the preceding Paragraphs.

XII.      REPORTING AND RECORDKEEPING

38.    <u>CAA Notifications</u>.  As specified in 40 C.F.R. § 60.7(a), WMA shall notify EPA in writing of:

a.    Any physical or operational change to the GCCS that may increase the emission rate of any air pollutant to which a standard applies, unless that change is specifically exempted as specified in the Landfill NSPS or in 40 C.F.R. § 60.14(e).  Such notification shall be postmarked 60 days or as soon as practicable before the change is commenced and shall include information describing the precise nature of the change, present and proposed emission control systems, productive capacity of the Landfill before and after the change, and the expected completion date of the change.  EPA may request additional relevant information subsequent to such notification.

b.    The date when demonstration of the CMS performance commences as specified in 40 C.F.R. § 60.13(c).  Notification shall be postmarked not less than 30 days prior to such date.

39.    Quarterly CAA Reports.

a.    WMA shall submit to EPA quarterly reports regarding its compliance with the requirements of the CAA regulations and the CAA provisions of this Consent Decree.  Each quarterly report shall cover the preceding calendar quarter and shall be due 60 days after the end of the calendar quarter (i.e., by May 30, August 30, November 30, and March 1).  Quarterly reports shall be submitted from the Effective Date until Defendants can demonstrate continuous compliance with all the CAA provisions of this Consent Decree, for a period of two years, including but not limited to, submission of a complete Title V permit application that includes all the CAA provisions of Paragraphs 10 and 38-40 of this Consent Decree as applicable requirements of the Title V permit.

b.    The quarterly reports shall include:

(1)    Information regarding the monitoring, operation and maintenance of the GCCS;

(2)    information regarding the status of any construction or compliance measures; problems encountered or anticipated, together with any

20

implemented solutions or proposed solutions; and the status of permit applications;

    (3)    for any non-compliance with the requirements of the CAA regulations and the CAA provisions of this Decree, (i) a description of such non-compliance (ii) an explanation of the likely cause of such non-compliance; and (iii) a description of the remedial steps taken, or to be taken, to prevent or minimize such non-compliance; and

    (4)    as specified in 40 C.F.R. § 63.10(d)(5): (i) a listing of all periods of five days or more in which the GCCS did not operate, and (ii) a listing of all periods of SSM, the actions taken during such periods, and a description of whether such actions were consistent with the SSM Plan.

    c.    For the period in which these quarterly reports are due under this Consent Decree, two consecutive quarterly reports shall constitute one semi-annual report for purposes of compliance with 40 C.F.R. § 62.14355(a) and 40 C.F.R. § 63.1980.

40.    CAA SSM Reporting and Recordkeeping Requirements.

    a.    WMA shall maintain at the Landfill a copy of the current SSM Plan. WMA also shall maintain at its central office superseded versions of the SSM Plan for a period of five years from the date that each was superseded. WMA shall maintain at the Landfill the most current version of the SSM Plan for at least two years after the GCCS ceases to operate. Upon request, WMA shall promptly provide to EPA a copy of any current or superseded SSM Plan.

    b.    WMA shall maintain records of all SSM events. The records shall include the following information: (i) a description of the SSM event; (ii) the time and duration of each SSM event; (iii) a description of any exceedance of any applicable emissions limitation regarding the SSM event; (iv) a description of the action(s) taken to address the SSM event; (v) an explanation whether the actions taken are consistent with the SSM Plan; and (vi) a description whether WMA followed the procedures specified in the SSM Plan. These records may take the form of a "checklist," or other effective form of recordkeeping that confirms conformance with the SSM Plan and describes the actions taken for that event. WMA shall maintain records regarding each SSM event for at least five years from the date of the event, in compliance with 40 C.F.R. § 63.10(b) as specified in Table 1 of the Landfill MACT.

    c.    If an action performed by WMA at the Landfill during an SSM event (including an action taken to correct a malfunction) is not consistent with the SSM Plan, and if the Landfill exceeds any applicable emission limitation, then WMA shall record the actions taken regarding the SSM event and shall report such actions to EPA

within two Business days after commencing the actions related to the SSM event, and shall report such action to EPA in a letter within seven Business days after the end of the event, in compliance with 40 C.F.R. § 63.10(d)(5) as specified in Table 1 of the Landfill MACT.

41.     WMA shall maintain at the Landfill copies of the GCCS Design Plan, the O&M Plan, and the SSM Plan, and any modifications, and shall make these documents available to EPA upon request.

42.     WMA shall submit a demonstration that it has successfully operated the GCCS for a period of at least two years after the initial performance test is conducted, as required by Paragraph 13, complied with Section XII (Reporting and Recordkeeping Requirements), and has timely applied for a Title V permit that includes all the CAA provisions of Paragraphs 10 and 38-40 as applicable requirements of the Title V permit, in accordance with Section XIII (Permits).  After demonstration is made to EPA's satisfaction, EPA will inform WMA in writing that WMA does not have to submit any further CAA related reports under Paragraph 39.  Thereafter reporting will be conducted solely pursuant to the Landfill MACT, the Federal Plan, and the Landfill's Title V permit.

43.     WMA shall comply with the reporting and recordkeeping requirements specified in 40 C.F.R. §§ 60.757 and 60.758, which include, but are not limited to, the following:

a.      WMA shall maintain at the Landfill, for at least five years, up-to-date, readily accessible, records of:

(1)     The design capacity report, the current amount of solid waste in-place, and the year-by-year waste acceptance rate as specified in 40 C.F.R. § 60.758(a).

(2)     The equipment operating parameters specified to be monitored as specified in 40 C.F.R. § 60.756 and 40 C.F.R. § 60.758(c), as well as records for periods of operation during which the parameter boundaries established during the most recent performance test are exceeded.

(3)     All records of exceedances of the GCCS operational standards specified in 40 C.F.R. § 60.753, records of the readings in the month subsequent to the recorded exceedance, whether or not the second reading is an exceedance, and records of the location of each exceedance as specified in § 60.758(e).

b.      WMA shall maintain at the Landfill, for the life of the control equipment, up-to-date, readily accessible records of the information listed in (1) through (4) below, as specified in 40 C.F.R. § 60.758(b)(1) through (b)(4).  Records of subsequent tests or monitoring shall be maintained for a minimum of five years.  Records of the control device vendor specifications shall be maintained until removal as

22

specified in 40 C.F.R. § 60.758(b).  These records shall demonstrate or document as appropriate:

    (1)    The maximum expected gas generation flow rate calculated using the equation specified in 40 C.F.R. § 60.755(a)(1) or as specified in another method approved by EPA.

    (2)    The density of wells, horizontal collectors, surface collectors, or other gas extraction devices determined using the procedures specified in 40 C.F.R. § 60.759(a)(1).

    (3)    The average combustion temperature measured at least every 15 minutes and averaged over the same time period of the performance test as specified in 40 C.F.R. § 60.758(b)(2)(i).

    (4)    The percent reduction of NMOC determined as specified in 40 C.F.R. § 60.752(b)(2)(iii)(B) achieved by the control device.

c.    WMA shall maintain at the Landfill, for the life of the collection system, an up-to-date, readily accessible plot map showing each existing and planned collector in the GCCS and providing a unique identification location label for each collector both on the map and at each collector.  This information shall also include:

    (1)    The installation date and location of all newly installed collectors, as specified in 40 C.F.R. § 60.755(b).

    (2)    The nature, date of deposition, amount, and location of asbestos-containing or nondegradable waste excluded from collection, as specified in 40 C.F.R. § 60.759(a)(3)(i).

    (3)    The amount, location, and age of material in any nonproductive areas excluded from collection, as specified in 40 C.F.R. § 60.759(a)(3)(ii), shall be documented and provided to EPA upon request.  A separate NMOC emissions estimate shall be made for each section proposed for exclusion, and the sum of all such sections shall be compared to the NMOC emissions estimate for the entire landfill.  Emissions from each section shall be computed using the equation specified in 40 C.F.R. § 60.759(a)(3)(ii).

44.    WMA shall keep records and reports as specified in 40 C.F.R. § 60.757 and 60.758. These include, but are not limited to, a file of all measurements, including CMS measurements; monitoring device and performance testing measurements; all CMS performance evaluations; all CMS or monitoring device calibration checks; adjustments and maintenance performed on these systems or devices; and all other information specified in 40 C.F.R. Part 60, recorded in a permanent form suitable for inspection, as

specified in 40 C.F.R. § 60.7(f).  The file shall be retained for at least two years following the date of such measurements, maintenance, reports, and records.

45.    RCRA, Scrap Tire, and Scrap Metal Reports.

    a.    WMA shall comply with RCRA recordkeeping requirements set forth in 40 C.F.R. § 258.29 except to the extent otherwise provided in Paragraphs 45.b and 45.c.

    b.    WMA shall submit semi-annual reports regarding its compliance with the RCRA requirements of this Consent Decree.  Each report shall cover the preceding six months (except as provided in the next subparagraph) and shall be due 30 days after the end of the second and fourth calendar quarters (*i.e.*, by July 30 and January 30).  Such reports shall be submitted from the Effective Date until two years after Certification of Completion of Closure in accordance with Paragraph 23 , or as the Parties may otherwise agree in writing.

    c.    The reports shall include information regarding status of any RCRA-related construction and/or compliance measures (including, but not limited to, compliance with Pre-Closure Care obligations set forth in Paragraph 18); problems encountered or anticipated, together with implemented or proposed solutions; status of permit applications; status of efforts to obtain financing for activities under this Decree; and planned efforts for obtaining financing for the next six month period.  After Closure, the reports shall include appropriate post-closure reporting in accordance with RCRA regulations and this Consent Decree. The reports shall also include (1) a description of any non-compliance with the requirements of the RCRA regulations and the RCRA provisions of this Decree; (2) an explanation of the likely cause of such non-compliance; and (3) a description of the remedial steps taken, or to be taken, to prevent or minimize such non-compliance.

    d.    The reports shall include information regarding the results of groundwater monitoring conducted in accordance with Paragraph 19.c.

    e.    The reports shall include information regarding compliance with the requirements for scrap tires under Section VIII, including the mosquito control measures undertaken during the reporting period.

    f.    The reports shall include information regarding compliance with the Scrap Metal requirements under Section IX during the reporting period.

46.    Notification of Non-Compliance, Violations or Other Events That May Pose a Threat to Public Health or Welfare or the Environment.  Whenever any non-compliance or violation of the Decree occurs, or any other event affecting WMA's performance under the Decree or the operation of the Landfill occurs, which may pose an immediate threat to the public health or welfare or the environment, WMA shall notify the EPA by

telephone and confirm (via email with a copy to the EPA ORC contacts) as soon as possible, but no later than 24 hours after WMA first knew of the non-compliance, violation or event. Notifications shall be made to the EPA CAA contact for issues related to the GCCS, and to EPA's RCRA contact for issues related to compliance with RCRA requirements. The notification shall include an explanation of the likely duration of the non-compliance; an explanation of the likely cause of the non-compliance; and an explanation of the remedial steps taken, or to be taken, to prevent or minimize such non-compliance. If the cause of a non-compliance cannot be fully explained at the time the report is due, WMA shall so state in the notification. WMA shall investigate the cause of the non-compliance and shall then submit an amendment to the notification, including a full explanation of the cause of the non-compliance, within 30 days of the day WMA becomes aware of the cause of the non-compliance. Nothing in this or the following Paragraph relieves WMA of its obligation to provide the notice required by Section XVI (Force Majeure).

47. Each report submitted by WMA under this Section, other than emergency or similar notifications where compliance would be impractical, shall be signed by an official of WMA and shall include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

48. Except as specified in Paragraph 39.c, the reporting requirements of the Decree do not relieve WMA of any reporting obligations required by the CAA or RCRA or their respective implementing regulations, or by any other federal, Territory, or local law, regulation, permit, or other requirement.

49. Any information provided pursuant to the Decree may be used by the United States in any proceeding to enforce the provisions of the Decree and as otherwise permitted by law.

50. WMA may, with EPA's written approval, change the location(s) at which records that are required under this Decree are maintained.

XIII.    PERMITS

51.    <u>Title V Air Permit</u>.  WMA shall, by the deadline specified in Appendix A, apply for, and shall in good faith and with due diligence cooperate with DPNR to obtain a Title V Operating Permit that includes the CAA provisions of Paragraphs 10 and 38-42 of this Consent Decree as applicable requirements in the Title V permit by timely supplying any additional information requested by DPNR and taking any other action required to ensure timely processing of the WMA's permit application.  WMA shall exercise best efforts to obtain the Title V permit within three years after applying for the permit.

52.    <u>Other Permits</u>.  Where any compliance obligation under this Section requires WMA to obtain a federal, territory, or local permit or approval, WMA shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.  WMA may seek relief under the provisions of Section XVI (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if WMA has submitted timely and complete applications and has timely taken all other actions necessary to obtain all such permits or approvals.

XIV.    FINANCING

53.    The GVI has represented: (i) that it does not have sufficient funds on hand to implement the Closure Work and a Significant Groundwater Corrective Action; (ii) that it must obtain such funding through various means including the sale of bonds; (iii) that approval by the Legislature of the Virgin Islands is required prior to the sale of any such bonds; and (iv) that the sale of bonds may be subject to certain financial limitations including the debt limit pursuant to the Revised Organic Act.  GVI shall obtain funding to fully and timely meet the requirements of this Decree and shall make such funding available to WMA to implement the Closure Work and any Significant Groundwater Corrective Action, subject to the following.

a.    Bonds.

(1)    GVI shall formally seek authorization from the Legislature of the Virgin Islands, through an appropriate submission by the Public Finance Authority ("PFA"), for the issuance of general obligation capital improvement bonds to finance the costs of compliance, the Closure Work and any Significant Groundwater Corrective Action.

(2)    The aggregate amount of such general obligation capital improvement bonds shall be not less than the estimated amount of future costs of compliance, the Closure Work and any Significant Groundwater Corrective Action less the estimated amount of funding that WMA reasonably estimates it has available as of the date of lodging of this

26

Consent Decree to pay such costs; provided, however, that the foregoing amount of such general obligation capital improvement bonds may be revised from time to time as appropriate to reflect changes in the estimated amount of future costs of compliance and of the Closure Work and/or the estimated amount of funding that WMA has available to pay such costs.

(3)     GVI and WMA, as applicable, shall use best efforts to secure approval by the Legislature of the Virgin Islands of the bonding authorization.

b.     After authorization, PFA, with the support of the GVI, shall use reasonable efforts to ensure that such bonds are offered for sale on commercially reasonable terms to finance the costs of compliance, the Closure Work and any Significant Groundwater Corrective Action at such times as funds are reasonably required for the payment of such costs.

c.     Solid Waste Fee.  By the end of 2014, GVI and WMA, as applicable, shall seek, and shall use reasonable efforts to secure, approval by the Legislature of the Virgin Islands or the Virgin Islands Public Services Commission, as applicable, for the prospective imposition of a solid waste fee, if and to the extent that such approval is necessary for the imposition of such fee.  Upon such approval by the Legislature of the Virgin Islands or the Virgin Islands Public Services Commission, as applicable, the GVI and WMA, as applicable, shall use reasonable efforts to assess and collect such solid waste fee.

d.     WMA may request the following changes to the Closure Schedule and to the schedule for any Significant Groundwater Corrective Action because of the unavailability of funding for any of the following reasons:

(1)     Failure of the Legislature of the Virgin Islands to authorize bonds.  If the GVI and/or WMA, as applicable, use best efforts to secure approval by the Legislature of the Virgin Islands of the bonding authorization in accordance with Paragraph 53.a(1), but the Legislature of the Virgin Islands fails to authorize such bonds, WMA may request the extension of the Closure Schedule and the schedule for Significant Groundwater Corrective Action for a period no longer than the time required to obtain such approval by the Legislature of the Virgin Islands.

(2)     Inability to sell bonds because of the debt limit pursuant to the Revised Organic Act or other applicable law.  If the bonds are authorized, and so long as PFA, with the support of the GVI, uses reasonable efforts to ensure that such bonds are offered for sale on commercially reasonable terms to finance the Closure Work and any Significant Groundwater Corrective Action, but the PFA is unable to sell or offer for sale such

bonds because of the debt limit pursuant to the Revised Organic Act or other applicable law, WMA may request the extension of the Closure Schedule for a period no longer than the time required to increase the debt limit to allow for the sale or offer for sale of such bonds.

(3) <u>Inability to sell bonds on commercially reasonable terms</u>. If the bonds are authorized, and so long as PFA, with the support of the GVI, uses reasonable efforts to ensure that such bonds are offered for sale on commercially reasonable terms to finance the Closure Work, and the PFA, with the support of the GVI is unable to sell or offer for sale such bonds on commercially reasonable terms, WMA may request the extension of the Closure Schedule and the schedule for any Significant Groundwater Corrective Action for a period no longer than the time required to sell or offer for sale such bonds on commercially reasonable terms.

(4) Any request shall be accompanied by a report containing a narrative description of GVI's and/or WMA's, as applicable, efforts to obtain financing for the obligations under the Decree and proposals for resolving problems identified in the report.

e. After receiving WMA and/or GVI's request under Paragraph 53.d, the United States, WMA, and the GVI shall meet and confer to discuss the report and shall use their best efforts to negotiate a modified Closure Schedule, and a modified schedule, if any, for any Significant Groundwater Corrective Action. If the United States, WMA and the GVI reach an agreement regarding modification(s) to the Closure Schedule, such agreement shall constitute a minor modification for purposes of Paragraph 100. The modified Closure Schedule shall supersede all prior Closure Schedules, and shall be deemed to be the "Closure Schedule" in effect for purposes of the Decree. If agreement is reached on a modified schedule for any Significant Groundwater Corrective Action, the modified schedule shall be in effect as a requirement of this Decree.

f. Any disputes concerning this Section XIV, including but not limited to any change to the Closure Schedule, shall be resolved pursuant to Paragraph 79.b of Section XVII (Dispute Resolution).

## XV.    STIPULATED PENALTIES

54. WMA shall be liable for stipulated penalties to the United States for non-compliance with or violation of this Consent Decree as specified below, unless excused under Section XVII (Dispute Resolution), or unless reduced or waived pursuant to Paragraph 66, or paid pursuant to Paragraph 64. Non-compliance or violation includes failing to perform any obligation required by the terms of this Decree, including any

work plan or schedule approved under this Decree, according to all applicable require-
ments of this Decree and within the specified time schedules established by or approved
under this Decree.

55.    <u>Late Payment of Civil Penalty</u>.  If Defendants fail to pay the civil penalty required to be
paid under Section V (Civil Penalty) when due, Defendants shall pay a stipulated penalty
of $500 per day for each day that their payment is late.

56.    <u>Compliance Milestones</u>.  The following stipulated penalties shall accrue per violation per
day for (a) the failure to submit a GCCS design plan under Paragraph 11.a; (b) the failure
to submit a GCCS O&M Plan under Paragraph 15; (c) the failure to submit a groundwater
monitoring system design plan under Paragraph 19.a; (d) the failure to submit a Closure
Plan under Paragraph 20.a; or (e) each failure to comply with the Closure Schedule.

| Penalty Per Violation Per day | Period of Noncompliance |
|---|---|
| $600 | 1st through 30th day |
| $1,250 | 31st through 90th day |
| $3,000 | 91st day and beyond |

57.    <u>Monitoring, Operation and Maintenance Requirements</u>.  The following stipulated
penalties shall accrue per violation per day for each failure to perform monitoring,
operations or maintenance as specified in Sections VI and VII.

| Penalty Per Violation Per day | Period of Noncompliance |
|---|---|
| $400 | 1st through 30th day |
| $650 | 31st through 90th day |
| $1,000 | 91st day and beyond |

58.    <u>Reporting and Recordkeeping Requirements and Scrap Tires</u>.  The following stipulated
penalties shall accrue per violation per day for each failure to keep records and/or
report in accordance with Section XII, and for each failure to comply with a deadline for
removal of scrap tires under Section VIII.

| Penalty Per Violation Per day | Period of Noncompliance |
|---|---|
| $300 | 1st through 30th day |
| $500 | 31st through 90th day |
| $750 | 91st day and beyond |

59.    <u>Scrap Metal</u>.  The following stipulated penalties shall accrue per violation per day for
each failure to comply with a deadline regarding scrap metal under Section IX.

| Penalty Per Violation Per day | Period of Noncompliance |
|---|---|
| $100 ...................................................... | 1st through 30th day |
| $200 ...................................................... | 31st through 90th day |
| $300 ...................................................... | 91st through 270th day |
| $500 ...................................................... | 271st day and beyond |

60.    Stipulated penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

61.    WMA shall self-assess, without prior demand from the United States, stipulated penalties accrued and owing under this Section in accordance with the following procedures:

a.    On or before the 60th day following the end of each quarter (*i.e.*, by May 31, August 31, November 30, and February 28 after lodging of this Consent Decree), WMA shall:

(1)    determine, and provide to EPA a detailed and accurate accounting of, the full amount of WMA's stipulated penalty liability, pursuant to Paragraphs 56 through 58, for the preceding quarter;

(2)    upon receipt of the WMA stipulated penalty report, EPA, in its discretion, may request a payment for accrued stipulated penalties; and

(3)    within 60 days of receiving EPA's request for payment of stipulated penalties, WMA must either, pay to the United States 50% of the amount calculated pursuant to Paragraph 61.a(1) or submit a request to EPA for a reduction of its stipulated penalty liability.

b.    Provided WMA timely follows the schedule and procedures set forth above, payment to the United States of the reduced amount specified in Paragraph 61.a(3) shall be deemed to discharge and settle WMA's liability for stipulated penalties under this Section for the violations that are the subject of such payments. Discharge and settlement as provided in this Paragraph shall be available to WMA only if WMA makes timely assessment and payment with respect to a particular violation of the Consent Decree during the quarter in question. In the absence of such timely action or a timely request for a reduction of stipulated penalty liability by WMA, WMA shall be liable for the full amount of the stipulated penalties for such violations during the quarter in question.

62.     If WMA has not self-assessed and paid stipulated penalties in accordance with Paragraph 61.a, WMA shall pay any stipulated penalty within 30 days of receiving the United States' written demand.

63.     Stipulated penalties shall continue to accrue as provided in Paragraph 80 during any Dispute Resolution proceeding regarding such stipulated penalties but need not be paid until the following:

   a.     If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, WMA shall pay accrued penalties determined to be owing, together with interest, to the United States within 45 days of the effective date of the agreement or the receipt of EPA's written decision or order unless a later date is agreed to by the parties.

   b.     If the dispute is appealed to the Court and the United States prevails in whole or in part, WMA shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 days of receiving the Court's decision or order unless a later date is agreed to by the parties, except as provided in the next subparagraph.

   c.     If any Party appeals the District Court's decision, WMA shall pay all accrued penalties determined by the final appellate court to be owing, together with interest, within 45 days of receiving the final appellate court decision, unless a later date is agreed to by the parties.

64.     WMA shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 9, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

65.     If WMA fails to pay stipulated penalties according to the terms of this Consent Decree, WMA shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for WMA's failure to pay any stipulated penalties.

66.     The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Section.

67.     Subject to the provisions of Section XIX (Effect of Settlement/Reservation Of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for WMA's violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree is also a violation of the CAA or RCRA, or either or both of their implementing regulations, WMA

shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation.

### XVI.     FORCE MAJEURE

68. "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement in this Paragraph that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible. "Force Majeure" may not include Defendants' failure to obtain funding necessary to perform such obligations.

69. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure, Defendants shall provide notice by telephone, with confirmation by facsimile transmission, to the EPA CAA and RCRA contacts in accordance with Section XXI (Notices) (and to any other persons that EPA may later designate in writing) within 72 hours of when Defendants first knew that the event might cause a delay. The United States may, in its unreviewable discretion, extend the time within which notice must be given. Such extension shall be effective only if in writing. Within seven days thereafter, Defendants shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a force majeure if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. If, despite good faith efforts, Defendants have not determined all actions to be taken to prevent or minimize delay, then they shall identify in the notice the date by which Defendants anticipate that they will determine the actions to be taken to prevent or minimize delay. Defendants shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or reasonably should have known.

70. If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected

by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  EPA will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

71.  If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendants in writing of its decision.

72.  If any of the Defendants elect to invoke the dispute resolution procedures set forth in Section XVII (Dispute Resolution), they shall do so no later than 30 days after receipt of EPA's notice under Paragraph 71.  In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 68 and 69.  If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to EPA and the Court.

## XVII.    DISPUTE RESOLUTION

73.  Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendants arising under this Decree.

74.  Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendants send the United States a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 45 days from the date the dispute arises, unless that period is modified by the parties by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 45 days after the conclusion of the informal negotiation period, Defendants invoke formal dispute resolution procedures as set forth below.

75.  Formal Dispute Resolution.  Defendants shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.  The

Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

76. The United States shall serve its Statement of Position within 45 days of receipt of Defendants' Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

77. Defendants may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XXI (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within 30 days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

78. The United States shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court. Defendants may file a reply memorandum, to the extent permitted by the Local Rules.

79. Standard of Review

   a. <u>Disputes Concerning Matters Accorded Record Review</u>. Except as otherwise may be provided in this Consent Decree, Defendants shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law, in any dispute brought under Paragraph 75 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, reports, schedules or any other items requiring approval by EPA under this Consent Decree, or pertaining to the adequacy of the performance of work undertaken pursuant to this Consent Decree, and all other disputes that are accorded review on the administrative record under applicable principles of administrative law.

   b. <u>Disputes Concerning Section XIV (Financing)</u>. In any dispute brought under this Section concerning Section XIV (Financing), including but not limited to any requested change to the Closure Schedule, GVI and/or WMA, as applicable, shall bear the burden of demonstrating by a preponderance of the evidence that their position is consistent with Paragraph 53.

c.    Other Disputes.  Except as otherwise provided in this Consent Decree, in any other dispute brought under this Section, Defendants shall bear the burden of demonstrating that their position complies with this Consent Decree.

80.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, except as provided in Paragraph 63, and unless and until final resolution of the dispute so provides.

## XVIII.    INFORMATION COLLECTION AND RETENTION

81.    The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into the Landfill and other locations where work is being performed pursuant to this Consent Decree, at all reasonable times, upon presentation of credentials, to:

a.    monitor the progress of activities required under this Consent Decree;

b.    verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c.    obtain samples and, upon request, splits of any samples taken by Defendants or its representatives, contractors, or consultants;

d.    obtain documentary evidence, including photographs and similar data; and

e.    assess Defendants' compliance with this Consent Decree.

82.    Upon request, Defendants shall provide EPA or its authorized representatives splits of any samples taken by Defendants.  Upon request, EPA shall provide Defendants splits of any samples taken by EPA.

83.    Until five years after the termination of this Consent Decree, Defendants shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary government, corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph within 30 days of receipt of such request by the United States.

84.     At the conclusion of the information-retention period provided in the preceding Paragraph, Defendants shall notify the United States at least 90 days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, Defendants shall deliver any such documents, records, or other information to EPA. Defendants may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If a Defendant asserts such a privilege, it shall provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by the Defendant.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

85.     Defendants may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Defendants seek to protect as CBI, Defendants shall follow the procedures set forth in 40 C.F.R. Part 2.  Any assertion of confidentiality shall be accompanied by sufficient documentation to satisfy the requirements of 40 C.F.R. § 2.204(e)(4).  Information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B.  If no such claim accompanies this information when it is submitted to EPA, it may be made available to the public by EPA, without further notice to Defendants.  No confidentiality claim shall be made with respect to any analytical data required pursuant to the CAA, RCRA, and this Consent Decree.

86.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or EPA pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or territorial laws, regulations, or permits.

                    XIX.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

87.     This Consent Decree resolves (a) the civil claims of the United States for the violations by Defendants alleged in the Complaint regarding the Landfill through the Effective Date; and (b) WMA's and GVI's liability for stipulated penalties under the Scrap Metal AOC and Anguilla RCRA AOC through the Effective Date.

88.     Reservations.  The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, and to address any imminent and substantial endangerment to the public health or welfare or the environment arising at,

                                        36

or posed by, the Landfill, whether related to the violations addressed in this Consent Decree or otherwise. This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the CAA and/or RCRA or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 87. The United States reserves the right to seek judicial orders requiring Defendants: (a) to comply with the Closure Schedule in the event Defendants are unable to obtain financing to timely complete their obligations under this Decree; and (b) to appoint and pay for a monitor to oversee and report on their compliance with this Decree. Defendants may seek any injunctive order or raise any available claim or defense to oppose any United States request for an injunctive order or other relief.

89.   In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, and/or other appropriate relief relating to the Landfill, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 87 or pursuant to any subsequent consent decree approved and entered in this action.

90.   This Consent Decree is not a permit, or a modification of any permit, under any federal, territorial, or local laws or regulations. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CAA or RCRA, or with any other provisions of federal, territorial, or local laws, regulations, or permits.

91.   This Consent Decree does not limit or affect the rights of Defendants or of the United States against any person who is not a party to this Consent Decree, including VIPA (except as provided in Paragraph 111), Joseph Hodge and Zulma Hodge, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

92.   This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

XX.      COSTS

93.   The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

XXI.       NOTICES

94.    Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

| | |
|---|---|
| To the United States: | Chief, Environmental Enforcement Section<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>Box 7611 Ben Franklin Station<br>Washington, D.C.  20044-7611<br>Re: DOJ No. 90-5-2-1-08776 |
| EPA CAA contact: | Kenneth Eng, Chief<br>Air Compliance Branch<br>Division of Enforcement and Compliance Assistance<br>U.S. Environmental Protection Agency, Region 2<br>290 Broadway, 21st Floor<br>New York, New York 10007-1866<br>Phone: 212-637-4080<br>Fax: 212-637-3998<br>eng.ken@epa.gov |
| EPA RCRA contact: | George C. Meyer P.E., Chief<br>RCRA Compliance Branch<br>Division of Enforcement and Compliance Assistance<br>U.S. Environmental Protection Agency, Region 2<br>290 Broadway, 21st Floor<br>New York, New York 10007-1866<br>Phone: 212-637-4070<br>Fax: 212-637-4478<br>meyer.george@epa.gov |
| EPA ORC contacts: | Liliana Villatora & Robert Hazen<br>U.S. Environmental Protection Agency, Region 2<br>Office of Regional Counsel<br>290 Broadway, 16th Floor<br>New York, New York 10007-1866<br>Phones: 212-637-3218 & 3215<br>Fax: 212-637-3199<br>villatora.liliana@epa.gov &<br>hazen.robert@epa.gov |

To GVI or WMA:    Honorable Vincent F. Frazer
           Attorney General
           GERS Building
           3438 Kronprindsens Gade – 2nd Floor
           St. Thomas, U.S. Virgin Islands  00802

           May A. Cornwall
           Executive Director
           Virgin Islands Waste Management Authority
           Post Office Box 1689, Kingshill
           St. Croix, U.S. Virgin Islands  00851
           macornwall@viwma.org

           Iver A. Stridiron, Esq.
           General Counsel
           Virgin Islands Waste Management Authority
           1A and B Demarara
           St. Thomas, VI 00802
           istridiron@viwma.org

           John Fehrenbach
           Winston & Strawn LLP
           1700 K Street, N.W.
           Washington, D.C.  20006
           jfehrenbach@winston.com

95. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above, or may add an additional notice recipient.

96. Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

XXII.   APPENDIX

97. Appendix A, Milestones and Timetable, is attached to and part of this Consent Decree.

XXIII.   EFFECTIVE DATE

98. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket, provided, however, that Defendants hereby agree that they shall be bound to perform duties scheduled to occur prior to the Effective Date.  In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent

Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall not be enforceable under this Consent Decree.

## XXIV. RETENTION OF JURISDICTION

99. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XVII and XXV, or effectuating or enforcing compliance with the terms of this Decree.

## XXV. MODIFICATION

100. This Consent Decree may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

101. Any disputes concerning modification of this Decree shall be resolved pursuant to Section XVII (Dispute Resolution), provided, however, that instead of the burden of proof provided by Paragraph 79 the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXVI. TERMINATION

102. Partial Termination

a. RCRA Requirements. After the Defendants complete all RCRA requirements, and demonstrate continued compliance, for a period of two years, with Paragraph 24 (Post Closure Care) and the RCRA reporting requirements of Paragraph 45 (RCRA, Scrap Tire, and Scrap Metal Reports), the Defendants may submit to the United States a written request for termination of all the RCRA and Waste Diversion requirements of the Consent Decree.

b. Scrap Tire Requirements. After the Defendants complete all Scrap Tire Removal requirements, the Defendants may submit to the United States a written request for termination of all the Scrap Tire Removal requirements of the Consent Decree.

c. Scrap Metal Requirements. After the Defendants complete all Scrap Metal requirements, the Defendants may submit to the United States a written request for termination of all the Scrap Metal requirements of the Consent Decree.

d. CAA Requirements. After the Defendants complete all CAA requirements, including, but not limited to, obtaining a Title V permit that includes all the CAA provisions of Paragraphs 38-40 of this Consent Decree as applicable

requirements of the Title V permit, and demonstrate continued compliance with Paragraphs 39 (Quarterly CAA Reports), and 40 (CAA SSM Reporting and Recordkeeping Requirements) for a period of two years, the Defendants may submit to the United States a request for termination of all the CAA requirements of the Consent Decree.

e.    Any request for partial termination under this Paragraph shall include: (1) a certification that Defendants have satisfied the CAA, RCRA, Scrap Tire and/or Scrap Metal requirements, as applicable; and (2) all necessary supporting documentation.

103.    <u>Final Termination</u>.  Defendants may seek partial termination under Paragraph 102 in a single submittal or separate multiple submittals to EPA.  If in a single submittal, the Defendants may request in that submittal the final termination of the Consent Decree.  If in separate multiple submittals, Defendants may request in the final submittal the final termination of the Consent Decree.

104.    Following receipt by the United States of Defendants' request(s) for termination, the Parties shall confer informally concerning the request and any disagreement that the Parties may have as to whether Defendants have satisfactorily complied with the requirements for partial and/or final termination of this Consent Decree.  If the United States agrees that the Decree may be partially and/or finally terminated, the Parties shall submit, for the Court's approval, a joint stipulation for, as applicable, the partial or final termination of the Decree.

105.    If the United States does not agree to Defendants' request for termination, Defendants may invoke Dispute Resolution under Section XVII.  However, any of Defendants shall not seek Dispute Resolution of any dispute regarding termination, under Paragraph 75, until 120 days after submission to the United States of its request for termination.

106.    After termination of the Consent Decree, the Defendants shall continue to meet their record retention obligations under Paragraphs 83 and 84 and any applicable obligations under law including, but not limited to, RCRA, the Federal Plan and the Landfill MACT.

XXVII.    PUBLIC PARTICIPATION

107.    This Consent Decree shall be lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  This Consent Decree is also subject to opportunity for public meeting under RCRA Section 7003(d), 42 U.S.C. § 6973(d).  Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to

41

challenge any provision of the Consent Decree, unless the United States has notified Defendants in writing that it no longer supports entry of the Consent Decree.

### XXVIII.    SIGNATORIES/SERVICE

108.    Each undersigned representative of Defendants and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

109.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

### XXIX.    INTEGRATION

110.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree, and except as provided in the next Paragraph, supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.   No other document, nor any representation, inducement, agreement, understanding or promise constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

111.    Upon the Effective Date, this Consent Decree supersedes the Scrap Metal AOC and the Anguilla RCRA AOC.  This Consent Decree does not supersede the following prior settlements, agreements, or understandings, or portions thereof, in the following specific matters in which any of the Defendants are Respondents: U.S. EPA, RCRA Consent Agreement and Final Order, Docket No. RCRA-02-2006-7109; and U.S. EPA, Complaint, Compliance Order and Notice of Opportunity for Hearing, and Consent Agreement and Final Order, Docket No. RCRA-02-2010-7111.  This Consent Decree does not supersede any Title V permit obtained in accordance with Section XIII (Permits).

### XXX.    FINAL JUDGMENT

112.    Upon approval and entry of the Bovoni Partial Consent Decree by the Court, the Bovoni Partial Consent Decree shall constitute a final judgment of the Court as to the United States and Defendants regarding Bovoni.  Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendants regarding Anguilla.  Collectively, the Bovoni Consent Decree and, upon approval and entry by the Court, this Consent Decree shall

constitute a final judgment of the Court as to the United States and Defendants.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

Dated and entered this __ day of _____, 20___


_____
UNITED STATES DISTRICT JUDGE

Signature Page for Partial Consent Decree Regarding Anguilla Landfill in
*U.S. v. Government of U.S. Virgin Islands*, et al., Civ. No. 3:10-0048

**FOR THE UNITED STATES OF AMERICA**:


1/11/13                          /s/ Ignacia S. Moreno
Date                             IGNACIA S. MORENO
                                 Assistant Attorney General
                                 Environment and Natural Resources Division
                                 U.S. Department of Justice

                                 MARK A. GALLAGHER, Senior Attorney
                                 MYLES FLINT, Trial Attorney
                                 Environmental Enforcement Section
                                 Environment and Natural Resources Division
                                 U.S. Department of Justice
                                 Washington, DC  20044-7611
                                 202-514-5405
                                 mark.gallagher1@usdoj.gov

                                 RONALD W. SHARPE
                                 United States Attorney
                                 District of the Virgin Islands

                                 JOYCELYN HEWLETT
                                 Assistant United States Attorney
                                 District of the Virgin Islands
                                 Federal Building and U.S. Courthouse
                                 5500 Veterans Drive, Room 260
                                 St. Thomas, USVI  00802
                                 340-774-5757
                                 joycelyn.hewlett@usdoj.gov

Signature Page for Partial Consent Decree Regarding Anguilla Landfill in
*U.S. v. Government of U.S. Virgin Islands*, et al., Civ. No. 3:10-0048

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY**:


/s/ Eric Schaff
ERIC SCHAAF
Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway, 16th Floor
New York, NY 10007


/s/ Liliana Villatora
LILIANA VILLATORA
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 2
Office of Regional Counsel
290 Broadway, 16th Floor
New York, NY 10007-1866


/s/ Robert Hazen
ROBERT HAZEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 2
Office of Regional Counsel
290 Broadway, 16th Floor
New York, NY 10007-1866

Of Counsel:

FLAIRE MILLS, Associate Regional Counsel
WILLIAM SAWYER, Chief, Waste and Toxic Substances Branch
U.S. Environmental Protection Agency, Region 2
Office of Regional Counsel
290 Broadway, 16th Floor
New York, NY 10007-1866

Signature Page for Partial Consent Decree Regarding Anguilla Landfill in
*U.S. v. Government of U.S. Virgin Islands*, et al., Civ. No. 3:10-0048

**FOR THE GOVERNMENT OF THE U.S. VIRGIN ISLANDS**:

12/18/12                              /s/ Vincent F. Frazer
Date                                      HONORABLE VINCENT F. FRAZER
                                              Attorney General
                                              GERS Building
                                              3438 Kronprindsens Gade, 2nd Floor
                                              St. Thomas, U.S. Virgin Islands  00802

                                              JOHN FEHRENBACH, ESQ.
                                              Winston & Strawn LLP
                                              1700 K Street, N.W.
                                              Washington, DC  20006
                                              202-282-5925
                                              jfehrenbach@winston.com

**FOR THE V.I. WASTE MANAGEMENT AUTHORITY**:

12/11/12                              /s/ Iver A. Stridiron
Date                                      IVER A. STRIDIRON, ESQ.
                                              General Counsel
                                              Virgin Islands Waste Management Authority
                                              1A and B Demarara
                                              St. Thomas, VI 00802

                                              JOHN FEHRENBACH, ESQ.
                                              Winston & Strawn LLP
                                              1700 K Street, N.W.
                                              Washington, DC  20006

APPENDIX A
MILESTONES AND TIMETABLE

| Line | Description | Deadline |
|---|---|---|
| 1 | Landfill closed to public, except construction & demolition ("C&D") waste | Date of lodging |
| 2 | Submit closure plan engineering report | Date of lodging |
| 3 | Submit Closure Plan, ¶ 20.a | Date of lodging |
| 4 | Submit GCCS design plan, ¶ 11.a | Date of lodging |
| 5 | Submit groundwater monitoring system design plan, ¶ 19.a | Date of lodging |
| 6 | Submit plan for investigation of contamination in Scrap Metal Area, ¶ 33.a | 1/31/2013 |
| 7 | Complete relocation of tires away from main landfill access road or commence maintaining alternative access road for emergency vehicles, ¶ 26 | 01/31/13 |
| 8 | Complete removal of all scrap tires, ¶ 25 | 3/15/2013 |
| 9 | Complete groundwater monitoring system for landfill perimeter, ¶ 19.b, and submit leachate report, ¶ 18.i | 8/31/2013 |
| 10 | Complete remediation of Scrap Metal Area A, ¶ 33.d | 6/14/2014 |
| 11 | South -- complete interim cover with slope stabilization and stormwater control as required, ¶ 18.g-h; install GCCS and route to temporary control system, ¶ 11.b, ¶ 14.d | 6/30/2014 |
| 12 | West -- complete interim cover with slope stabilization and stormwater control as required, ¶ 18.g-h; install GCCS and route to temporary control system, ¶ 11.b, ¶ 14.d | 6/30/2015 |
| 13 | Complete construction and commence operation of scrap metal management facility, ¶ 34 | 7/14/2015 |
| 14 | Complete removal of scrap metal from Scrap Metal Area B, ¶ 32 | 8/14/2015 |
| 15 | Complete remediation of Scrap Metal Areas B and C, ¶ 33.d | 1/31/2016 |
| 16 | North – complete interim cover with slope stabilization and stormwater control as required, ¶ 18.g-h; install GCCS, ¶ 11.b; complete and commence operating flare system, ¶ 14.e | 6/30/2016 |
| 17 | Apply for GCCS control system Title V permit, ¶ 51 | 6/30/2016 |
| 18 | Obtain GCCS control system Title V permit, ¶ 51 | 6/30/2017 |
| 19 | Submit initial performance test protocol, ¶ 13 | 8/30/2017 |
| 20 | Complete initial performance test, ¶ 13 | 8/30/2017 |
| 21 | Submit GCCS O&M plan, ¶ 15 | 8/30/2017 |
| 22 | Submit GCCS SSM plan, ¶ 16 | 8/30/2017 |
| 23 | Permanently cease accepting waste at Landfill, ¶ 21 | 9/30/2018 |
| 24 | Top and East -- install GCCS, ¶ 11.b | 10/31/2018 |
| 25 | Complete modifications to GCCS, ¶ 11.c | 12/31/2018 |
| 26 | Top and East -- complete interim cover with slope stabilization and stormwater control as required, ¶ 18.g-h | 06/30/2019 |
| 27 | Closure – complete stormwater measures, ¶ 18.g-h; fill and grade and install cap and cover over entire filled Landfill area, ¶ 21 | 06/30/2020 |