# EXHIBIT N

DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,         :
         :
    Plaintiff,         :
         :
    v.         :     Civil No. 3:10-cv-48
         :
THE GOVERNMENT OF THE VIRGIN ISLANDS,  :   **AMENDED**
VIRGIN ISLANDS PORT AUTHORITY, VIRGIN  :   **COMPLAINT**
ISLANDS WASTE MANAGEMENT AUTHORITY,  :
JOSEPH HODGE and ZULMA HODGE,   :
         :
    Defendants.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

The United States of America, by authority of the Attorney General of the United States

and through the undersigned attorneys, acting at the request of the Regional Administrator of the

United States Environmental Protection Agency ("EPA"), Region 2, files this amended

complaint and alleges as follows:

<u>NATURE OF THE ACTION</u>

1.    This is a civil action:

    a.    Against the Government of the Virgin Islands ("GVI") and the Virgin
Islands Waste Management Authority ("VIWMA") under the Clean Air Act, as amended
("CAA"), 42 U.S.C. §§ 7401 *et seq*., for violations of the federal standards set forth in
40 C.F.R. Part 62, Subpart GGG, §§ 62.14350-14356 (the "Federal Plan"), and for
violations of the National Emission Standards for Hazardous Air Pollutants for Municipal
Landfill Maximum Achievable Control Technology ("Landfill MACT"), found at
40 C.F.R. Part 63, Subpart AAAA, §§ 63.1930-63.1990, at the Bovoni municipal solid
waste landfill, in St. Thomas, U.S.V.I. ("Bovoni");

    b.    Against GVI under Section 7003(b) of the Resource Conservation and
Recovery Act ("RCRA"), 42 U.S.C. § 6973(b), for non-compliance with an
administrative order on consent ("AOC") issued by EPA under Section 7003(a) of
RCRA, 42 U.S.C. § 6973(a), regarding Bovoni;

c.      Against GVI, VIWMA, and the Virgin Islands Port Authority ("VIPA") under the CAA for violations of the Federal Plan and the Landfill MACT at the Anguilla municipal solid waste landfill, in St. Croix, U.S.V.I. ("Anguilla");

d.      Against the GVI and VIPA under RCRA for violations of an EPA AOC issued under Section 7003(a) of RCRA regarding Anguilla; and

e.      Against the GVI, VIWMA, and Joseph and Zulma Hodge (the "Hodges") under RCRA for violations of an EPA AOC issued under Section 7003(a) of RCRA regarding scrap tire disposal adjacent to Bovoni.

2.      The United States seeks an award of civil penalties and stipulated penalties for the defendants' failures to comply with the CAA and RCRA and the three AOCs, and injunctions requiring the defendants to comply with the CAA and RCRA and the three AOCs.

JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Section 7003(b) of RCRA, 42 U.S.C. § 6973(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

4.      Venue is proper in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Section 7003 of RCRA, 42 U.S.C. § 6973, and 28 U.S.C. §§ 1391(b), (c) and 1395(a), because the violations occurred in this district and Bovoni and Anguilla are located in this district.

NOTICE AND AUTHORITY

5.      The United States has provided notice of the commencement of this action to GVI as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

6.      Authority to bring this action is vested in the United States Department of Justice under 28 U.S.C. §§ 516 and 519.

<u>D<small>EFENDANTS</small></u>

7.      The GVI owns Bovoni and, through its Department of Public Works, operated Bovoni and Anguilla until approximately June 2004.

8.      The GVI owns property one quarter mile southeast of Bovoni which contains a scrap tire dump.

9.      VIPA is a public corporation under the laws of the U.S. Virgin Islands, has responsibility for harbors and marine terminals in the Virgin Islands and owns Anguilla.

10.     VIWMA is a public corporation under the laws of the U.S. Virgin Islands, has responsibility for solid waste management in the Virgin Islands and has operated Bovoni and Anguilla since approximately June 2004.

11.     The Hodges are residents of St. Thomas, U.S. Virgin Islands, and they own a parcel of property northwest of Bovoni that contains a scrap tire dump.

12.     GVI, VIWMA, VIPA, Joseph Hodge and Zulma Hodge are each a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e), and Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).  <u>See also</u>, Section 1004(31) of RCRA, 42 U.S.C. § 6903(31).

<u>S<small>TATUTORY AND</small> R<small>EGULATORY</small> B<small>ACKGROUND</small> - C<small>LEAN</small> A<small>IR</small> A<small>CT</small></u>

13.     The CAA was enacted to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population.  Section 101(b)(1) of the CAA, 42 U.S.C. § 7401(b)(1).

14.     Section 114(a)(iii) of the CAA grants EPA the authority to require submission of information to enable it to assess compliance with, among other things, any standard of performance promulgated under Section 111 of the CAA, and any emission standard promulgated under Section 112 of the CAA.

Federal Plan and New Source Performance Standards

15.     Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires the Administrator of EPA ("Administrator") to publish a list of categories of stationary sources that cause or significantly contribute to air pollution which may reasonably be anticipated to endanger public health or welfare.  The Administrator has identified municipal solid waste ("MSW") landfills as one such category.

16.     Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), requires the Administrator to promulgate regulations establishing federal standards of performance for new sources of air pollutants within each category.  "New sources" are defined as stationary sources, the construction or modification of which is commenced after the publication of regulations or proposed regulations prescribing a standard of performance applicable to such source.  42 U.S.C. § 7411(a)(2).  These standards are known as the New Source Performance Standards ("NSPS").

17.     Pursuant to Section 111 of the CAA, 42 U.S.C. § 7411, the Administrator promulgated NSPS for MSW landfills that commenced construction, reconstruction or modification on or after May 30, 1991.  These standards are found at 40 C.F.R. Part 60, Subpart WWW, §§ 60.750-60.759.  These standards are hereinafter referred to as the "Landfill NSPS."

18.     Section 111(d) of the CAA requires the Administrator to promulgate regulations, establishing a procedure whereby states submit a plan for standards of performance for any existing source of any air pollutant to which a new standard of performance would apply.  "Existing sources" are defined as any stationary source other than a new source.  42 U.S.C. § 7411(a)(6).

19.     Pursuant to Section 111(d) of the CAA, 42 U.S.C. § 7411(d), the Administrator promulgated emission guidelines for the development of state plans that apply to existing MSW

landfills that commenced construction prior to May 30, 1991 and that have not been modified or reconstructed since May 30, 1991, and for the development of a federal plan for such existing MSW landfills where a state does not have an approved state plan.

20.     Pursuant to Section 111(d) of the CAA, 42 U.S.C. § 7411(d), EPA promulgated the "Federal Plan Requirements for Municipal Solid Waste Landfills That Commenced Construction Prior to May 30, 1991 and Have Not been Modified or Reconstructed Since May 30, 1991," 40 C.F.R. Part 62, Subpart GGG, 40 C.F.R. §§ 62.14350-62.14356 ("Federal Plan").

21.     Pursuant to 40 C.F.R. § 62.14350 of the Federal Plan, the Federal Plan applies to each designated facility as defined in 40 C.F.R.§ 62.14352; and pursuant to 40 C.F.R. § 62.14352 a designated facility is each municipal solid waste landfill, in all states, protectorates, and Indian Country, that commenced construction, reconstruction, or modification before May 30, 1991, that is not subject to a state plan, and where the state, protectorate or Indian Country did not submit a negative declaration letter, and which has accepted waste at any time since November 8, 1987 or has additional capacity for future waste deposition.  The GVI does not have an approved state plan, and has not submitted a negative declaration letter.  Therefore, the Federal Plan applies to GVI's MSW landfills that commenced construction prior to May 30, 1991 and that have not been modified or reconstructed since May 30, 1991.

22.     The Federal Plan requires that designated facilities that commenced construction prior to May 30, 1991, and that were not modified or reconstructed since May 30, 1991 comply with specified requirements of the Landfill NSPS.  40 C.F.R. §§ 62.14353(b), 62.14354(a), 62.14354(b) and 62.14355(a).

23.     "Municipal solid waste landfill" is defined as "an entire disposal facility in a contiguous geographical space where household waste is placed in or on land." 40 C.F.R. § 62.14351.

24.     Sections 111(a)(5), and 112 (a)(9) of the CAA and 40 C.F.R. § 63.2 define "owner or operator" as any person who owns, leases, operates, controls, or supervises a stationary source. Title 40 C.F.R. § 60.2 defines "owner or operator" as any person who owns, leases, operates, controls, or supervises an affected facility or a stationary source of which an affected facility is a part.

25.     Pursuant to 40 C.F.R. § 62.14353(b) of the Federal Plan, the owner or operator of a designated facility that has a design capacity of at least 2.5 million megagrams ("Mg") by mass and 2.5 million cubic meters ("m$^3$") by volume must comply with the requirements specified in 40 C.F.R. § 752(b) of the Landfill NSPS.

26.     Pursuant to 40 C.F.R. § 62.14355(a) of the Federal Plan, the owner or operator of each designated MSW landfill must submit to the Administrator an initial design capacity report for the landfill, as specified in 40 C.F.R. § 60.757(a) of the Landfill NSPS.

27.     Pursuant to 40 C.F.R. § 62.14355(a) of the Federal Plan, the initial design capacity report must contain, *inter alia*, a map or plot of the landfill that provides the size and location of the landfill and that identifies the areas where solid waste may be placed, as specified in 40 C.F.R. § 60.757(a) of the Landfill NSPS.

28.     Pursuant to 40 C.F.R. § 62.14355(a)(1), the initial design capacity report is due within 90 days of the effective date of the Federal Plan. The effective date of the Federal Plan is January 7, 2000. *See* 40 C.F.R. § 62.14356(c)(1). Therefore, the required date for the initial design capacity report is April 6, 2000.

29.      Pursuant to 40 C.F.R. § 62.14355(a) of the Federal Plan, the owner or operator of each designated MSW landfill must submit a non-methane organic compound ("NMOC") emissions rate report initially and annually thereafter, as specified in 40 C.F.R. § 60.757(b) of the Landfill NSPS.  The NMOC emissions rate report must contain calculations of the amount of landfill gas estimated to be emitted from the landfill.

30.      Pursuant to 40 C.F.R. § 62.14355(a)(2), the initial NMOC emissions rate report is due within 90 days of the effective date of the Federal Plan, *i.e.*, on April 6, 2000, and the annual NMOC reports are due annually commencing on April 6, 2001.

31.      Pursuant to 40 C.F.R. § 62.14356(a)(1), the owner or operator of each regulated MSW landfill that has a design capacity of at least 2.5 million Mg by mass and 2.5 million $m^3$ by volume, and a calculated NMOC emission rate of at least 50 Mg/year must submit to the Administrator a design plan for a landfill gas collection and control system ("GCCS") that captures and controls the gas generated by the landfill, as specified in 40 C.F.R. § 60.752(b) of the Landfill NSPS.

32.      Pursuant to 40 C.F.R. § 62.14356(a)(1) of the Federal Plan, the GCCS design plan must comply with the requirements of 40 C.F.R. § 62.14353(b) of the Federal Plan and those specified in 40 C.F.R. § 60.752(b)(2) of the Landfill NSPS.

33.      Pursuant to 40 C.F.R. § 62.14356(a)(1)-(5) of the Federal Plan, and as specified in 40 C.F.R. § 60.752(b)(2) of the Landfill NSPS and Table 3 of the Federal Plan, the owner or operator of a designated facility that has a design capacity of at least 2.5 million Mg by mass and 2.5 million $m^3$ by volume, and a calculated NMOC emission rate of at least 50 Mg per year must do the following after the initial NMOC emissions rate report or an annual NMOC emission rate report shows an NMOC emission rate of at least 50 Mg per year:  (1) submit a GCCS design plan

to the Administrator within one year; (2) award contracts to initiate on-site construction or initiate on-site installation of a GCCS within 20 months; (3) initiate on-site construction or initiate on-site installation of a GCCS within 24 months; (4) complete on-site construction or installation of a GCCS within 30 months; and (5) achieve final compliance by operating the GCCS as specified in the final GCCS design plan within 30 months.

34. Pursuant to 40 C.F.R. § 62.14356(a)(1)-(5) of the Federal Plan, and as specified in 40 C.F.R. § 60.752(b)(2) of the Landfill NSPS and Table 3 of the Federal Plan, the owner or operator of a designated facility that has a design capacity of at least 2.5 million Mg by mass and 2.5 million $m^3$ by volume, and a calculated NMOC emission rate of at least 50 Mg per year by April 6, 2000 must: (1) submit the GCCS Design Report to the Administrator, by April 6, 2001; (2) award contracts to initiate on-site construction or initiate on-site installation of a GCCS, by December 6, 2001; (3) initiate on-site construction or initiate on-site installation of a GCCS, by April 6, 2002; (4) complete on-site construction or installation of a GCCS, by October 6, 2002; and (5) achieve final compliance by operating the GCCS as specified in the final GCCS design plan, by October 6, 2002.

35. Pursuant to 40 C.F.R. § 62.14356(b) of the Federal Plan, and as specified in 40 C.F.R. § 752(b)(2)(i) of the Landfill NSPS, the owner or operator of each regulated MSW landfill that has a design capacity of at least 2.5 million Mg by mass and 2.5 million $m^3$ by volume, and a calculated NMOC emission rate of at least 50 Mg per year must: (a) install a collection and control system that captures the gas generated within the landfill as specified in 40 C.F.R. § 752(b)(2)(ii) (A) or (B) of the Landfill NSPS; (b) route the gas generated within the landfill to a control system that complies with the requirements specified in 40 C.F.R. § 752(b)(2)(iii) (A), (B), or (C) of the Landfill NSPS; and (c) operate the collection and control

device installed to comply with the requirements specified in the Landfill NSPS, within 30 months after submission of the initial NMOC emissions rate report or an annual NMOC emission rate report showing that NMOC emissions are at least 50 Mg per year.

36.     Pursuant to 40 C.F.R. § 62.14355(a) of the Federal Plan, the owner or operator of each designated MSW landfill must comply with the recordkeeping and reporting provisions of the Landfill NSPS, *i.e.*, 40 C.F.R. § 60.757 and 60.758.

37.     Pursuant to 40 C.F.R. § 62.14354(b) of the Federal Plan, the owner or operator of a designated facility that uses a GCCS to comply with 40 C.F.R. § 62.14353(b) must comply with the operational standards specified in 40 C.F.R. § 60.753 of the Landfill NSPS, the test procedures specified in 40 C.F.R. § 60.754(b) and (d) of the Landfill NSPS, the compliance provisions specified in 40 C.F.R. § 60.755 of the Landfill NSPS, and the monitoring provisions specified in 40 C.F.R. § 60.756 of the Landfill NSPS.

Maximum Achievable Control Technology Standard

38.     Section 112 of the CAA, 42 U.S.C. § 7412, directs EPA to publish a list of all categories and subcategories of major sources and area sources of hazardous air pollutants and provides an initial list of hazardous air pollutants ("HAPs") at Section 112(b)(1) of the CAA. Section 112(d) of the CAA directs EPA to promulgate regulations establishing emission standards for each category or subcategory of major and area sources of hazardous air pollutants.

39.     Section 112(a)(1) of the CAA defines "major source" as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit, considering controls, in the aggregate, ten tons or more of any hazardous air pollutant or 25 tons per year or more of any combination of HAPs.

40.     Section 112(a)(2) of the CAA defines "area source" as any stationary source of HAPs that is not a major source.

41.     Section 112(a)(3) of the CAA defines "stationary source" as any building, structure, facility, or installation which emits or may emit any air pollutant.

42.     Under the authority granted by Sections 112 and 114 of the CAA, on January 16, 2003, the Administrator promulgated the Municipal Solid Waste Landfills Maximum Achievable Control Technology ("Landfill MACT") regulations.  These standards are found at 40 C.F.R. Part 63, Subpart AAAA, §§ 63.1930-1990.

43.     Pursuant to 40 C.F.R. § 63.1935, of the Landfill MACT, an owner or operator of an MSW landfill that has accepted waste since November 8, 1987 or has additional capacity for waste deposition and is an area source with a design capacity of at least 2.5 million Mg by mass and 2.5 million m$^3$ by volume that has a calculated emissions rate of at least 50 Mg NMOC per year is subject to the Landfill MACT.

44.      Pursuant to 40 C.F.R. § 63.1930 of the Landfill MACT, all landfills subject to the Landfill MACT must meet the requirements of 40 C.F.R. Part 60, Subpart Cc or WWW, as of the effective date of the MACT, *i.e.*, by January 16, 2004.

45.     Pursuant to 40 C.F.R. 63.1955(a)(1) and (2) of the Landfill MACT, all landfills subject to the Landfill MACT must meet the requirements of the Landfill NSPS, the Federal Plan or state plan that implements 40 C.F.R. Part 60, Subpart Cc.

46.     Pursuant to 40 C.F.R. § 63.1960 of the Landfill MACT, the owner or operator of an MSW landfill subject to the Landfill MACT must develop and implement a written start-up, shutdown or malfunction ("SSM") plan for the landfill that complies with the provisions in

40 C.F.R. § 63.6(e)(3) of the Federal Plan. Pursuant to 40 C.F.R. § 63.1960 of the Landfill

MACT, a copy of the SSM plan must be maintained on site.

47.      Pursuant to 40 C.F.R. § 63.1980(a) of the Landfill MACT, the owner or operator

of the MSW landfill subject to the Federal Plan must keep records and reports as specified in the

Federal Plan except that annual compliance reports described in 40 C.F.R. § 60.757(f) of the

Landfill NSPS must be submitted every six months.

<u>Enforcement Provisions</u>

48.      Section 113(a)(3) of the CAA, 42 U.S.C. § 7413(a)(3), authorizes the

Administrator to bring a civil action against any person who has violated specified requirements

of the CAA, including any requirement under the Federal Plan, the Landfill MACT and/or

NSPS.

49.      Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Administrator to

commence a civil action for a penalty of not more than $25,000 per day per violation against the

owner or operator of an affected source whenever such person has violated specified

requirements of the CAA, including requirements of the Federal Plan, the Landfill MACT and/or

NSPS.

50.      Pursuant to the Federal Civil Penalties Inflation Adjustment CAA of 1990,

28 U.S.C. 2461, as amended by the Debt Collection Improvement Act of 1996, ("DCIA")

31 U.S.C. 3701, and pursuant to the EPA's Civil Monetary Penalty Inflation Adjustment Rule,

69 Fed. Reg. 7,121 (Feb. 13, 2004), and 40 C.F.R. Part 19 promulgated pursuant to the DCIA,

the maximum amount of the daily penalty shall increase from $25,000 to:

            a.      $27,500 for each violation occurring between January 31, 1997, and
                    March 15, 2004;

        b.      $32,500 for each violation occurring between March 15, 2004 and January 12, 2009; and

        c.      $37,500 for each violation occurring after January 12, 2009.

<u>STATUTORY AND REGULATORY BACKGROUND - RCRA SECTION 7003</u>

51.      The comprehensive federal program for the regulation of solid waste and hazardous waste is primarily based on RCRA (enacted in 1976 to amend the Solid Waste Disposal Act), and on the Hazardous and Solid Waste Amendments Act, enacted in 1984. 42 U.S.C. § 6901 *et seq*. *See also* implementing regulations at 40 C.F.R. Parts 239-273.

52.      Pursuant to Sections 2002, 4004 and 4010 of RCRA, 42 U.S.C. §§ 6912, 6944 and 6949a, EPA promulgated regulations regarding the location, restrictions, design and operating criteria for MSW landfills which are set forth at 40 C.F.R. Part 258.

53.      In addition to its regulatory and permit scheme, RCRA authorizes EPA to address circumstances involving an imminent and substantial endangerment to public health and the environment. Section 7003(a) of RCRA, 42 U.S.C. § 6973(a), provides, in pertinent part:

> Notwithstanding any other provision of this chapter, upon receipt of evidence that the past or present handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court . . . The Administrator may also, after notice to the affected State, take other action under this section, including, but not limited to, issuing such orders as may be necessary to protect public health and the environment.

54.      Section 7003(b) of RCRA, 42 U.S.C. § 6973(b) provides that any person who willfully violates or fails or refuses to comply with an order of the Administrator issued under Section 7003(a), 42 U.S.C. § 6973(a) may be liable for civil penalties for such violations or failures to comply.

<u>G</u><small>ENERAL</small> <u>A</u><small>LLEGATIONS</small>

<u>Non-Compliance with the CAA at Bovoni</u>

55.     Bovoni comprises approximately 34 acres on a peninsula between Mangrove

Lagoon and Bovoni Bay on the southern coast of St. Thomas.  The landfill has been in operation

since approxiately 1979.  It receives residential, commercial and industrial wastes for disposal.

The landfill accepts approximately 97,000 tons of municipal solid waste per year for on-site

disposal.

56.     Bovoni is a "municipal solid waste landfill" within the meaning of 40 C.F.R.

§ 62.14351 of the Federal Plan, and a "designated facility" within the meaning of  40 C.F.R.

§ 62.14352.

57.     GVI and VIWMA each is an "owner or operator" within the meaning of

Sections 111(a)(5) and 112 (a)(9) of the CAA, 42 U.S.C. §§ 7411(a)(5) and 7411(a)(5),

40 C.F.R. § 63.2, and 40 C.F.R. § 60.2.

58.     Bovoni is subject to the requirements of the Federal Plan because construction of

Bovoni was commenced prior to May 30, 1991, Bovoni has not been modified or reconstructed

since May 30, 1991, and the GVI does not have an approved state plan.

59.     The GVI and VIWMA are subject to the Landfill MACT because Bovoni has

accepted waste since 1979, has additional capacity for waste deposition, and is an area source

landfill with a design capacity of at least 2.5 million Mg or 2.5 million m$^3$, and a calculated

NMOC emissions rate of 50 Mg or greater per year.

60.     On or about November 10, 2004, VIWMA submitted to the EPA Region 2

Administrator a design capacity report for Bovoni.  The design capacity report, although

13

incomplete, accurately showed that as of April 6, 2000 Bovoni had a design capacity greater than 2.5 million Mg by mass and 2.5 million $m^3$ by volume.

61.     On or about November 10, 2004, VIWMA submitted a NMOC report for Bovoni to the EPA Region 2 Administrator.  The NMOC report indicates that Bovoni's NMOC emission rate was greater than 50 Mg/yr on April 6, 2000.

62.     On or about January 24, 2008, VIWMA submitted a corrected NMOC emission rate report for Bovoni to the EPA Region 2 Administrator.  The corrected NMOC emission rate report shows that on April 6, 2000 Bovoni had a calculated NMOC emission rate greater than 50 Mg/yr.

63.     Because Bovoni has a design capacity greater than 2.5 million Mg by mass and 2.5 million $m^3$ by volume and a calculated emissions rate of greater than 50 Mg per year of NMOC, the owners and operators of Bovoni are required to comply with the Federal Plan, 40 C.F.R. §§ 62.14350-14356, and the Landfill MACT, 40 C.F.R. §§ 63.1930-1990.

64.     On or about November 10, 2005, VIWMA submitted to the EPA Region 2 Administrator an incomplete GCCS design plan for Bovoni.

65.     On August 25, 2006, EPA issued to GVI and VIWMA a Compliance Order (EPA Docket No. CAA-02-2006-1002) ("Bovoni Air CO") in which EPA found violations of the Landfill MACT and the Federal Plan at Bovoni.  The Bovoni Air CO required that GVI and VIWMA take specific actions to come into compliance with the CAA.

66.     On or about March 5, 2008, VIWMA submitted to the EPA Region 2 Administrator a revised GCCS design plan for Bovoni.

67.     The GVI and VIWMA did not comply with the Bovoni Air CO.

14

Non-Compliance with the CAA at Anguilla

68.     Anguilla comprises approximately 30 acres and is located on the island of
St. Croix.  The landfill has been in operation since approxiately 1966.  It receives residential,
commercial and industrial wastes for disposal.  The landfill accepts approximately 117,000 tons
of municipal solid waste per year for on-site disposal.

69.     Anguilla is a "municipal solid waste landfill" within the meaning of 40 C.F.R.
§ 62.14351 of the Federal Plan, and a "designated facility" within the meaning of  40 C.F.R.
§ 62.14352.

70.     The GVI, VIWMA and VIPA each is an "owner or operator" within the meaning
of Sections 111(a)(5) and 112 (a)(9) of the CAA, 42 U.S.C. §§ 7411(a)(5) and 7411(a)(5),
40 C.F.R. § 63.2, and 40 C.F.R. § 60.2.

71.     Anguilla is subject to the requirements of the Federal Plan because construction
of Anguilla was commenced prior to May 30, 1991, Anguilla has not been modified or
reconstructed since May 30, 1991, and the GVI does not have an approved state plan.

72.     The GVI, VIWMA and VIPA are subject to the Landfill MACT because Anguilla
has accepted waste since 1966, has additional capacity for waste deposition, and is an area
source landfill with a design capacity of at least 2.5 million Mg or 2.5 million $m^3$, and a
calculated NMOC emissions rate of 50 Mg or greater per year.

73.     On or about November 15, 2005, VIWMA submitted to the EPA Region 2
Administrator a design capacity report showing that as of April 6, 2000 Anguilla had a design
capacity greater than 2.5 million Mg by mass and 2.5 million $m^3$ by volume, and an NMOC
emission rate report for Anguilla showing that it had an NMOC emission rate of 50 Mg or
greater per year.

74.     On August 2, 2007, VIWMA revised and submitted updated design capacity and NMOC emission rate reports ("August 2007 Reports") showing that Anguilla did not have a design capacity greater than 2.5 million Mg by mass and 2.5 million m$^3$ by volume.  On March 19, 2008, VIWMA submitted supporting documentation for the August 2007 Reports to EPA.

75.     On March 3, 2009 EPA advised GVI, VIWMA and VIPA that the August 2007 Reports were deemed unacceptable because they contained several incorrect assumptions.

76.     On or about August 15, 2007, VIWMA submitted an incomplete GCCS design plan for Anguilla to the EPA Region 2 Administrator.  On or about June 12, 2009, VIWMA submitted a revised incomplete GCCS design plan for Anguilla to the EPA Region 2 Administrator.

77.     Because Anguilla has a design capacity greater than 2.5 million Mg by mass and 2.5 million m$^3$ by volume and a calculated emissions rate of greater than 50 Mg per year of NMOC, the owners and operators of Anguilla are required to comply with the Federal Plan, 40 C.F.R. §§ 62.14350-14356, and the Landfill MACT, 40 C.F.R. §§ 63.1930-1990.

78.     On August 28, 2006, EPA issued to VIPA and VIWMA a Compliance Order (EPA Docket No. CAA-02-2006-1003) ("Anguilla Air CO") in which EPA found violations of the Landfill MACT and the Federal Plan at Anguilla.  The Anguilla Air CO required that VIPA and VIWMA take specific actions to come into compliance with the CAA.

79.     VIPA and VIWMA did not comply with the Anguilla Air CO.

Non-Compliance with Bovoni RCRA AOC

80.     During the period prior to June 2000, EPA observed a number of improper waste management practices at Bovoni, including the following (Bovoni AOC ¶¶ 8-27):

16

a.      Inconsistent application of daily earthen cover on the operating face of the landfill, causing possible disease vectors, rodent infestation, run-off, bird activity and other harmful effects;

b.      Improper disposal of medical waste and septic waste, thus endangering the public health of the health of the landfill's employees;

c.      Subterranean and surface fires at the landfill;

d.      Improper storage and disposal of used oil at the landfill, causing possible contamination of the soils and ground water with toxic metals, benzene, the chlorinated solvent tetrachloroethylene and polycyclic aromatic hydrocarbons, and possible endangerment to human health and the environment;

e.      Improper disposal and burial of lead-acid batteries, causing possible contamination of the soil with lead and sulfuric acid, and possible contamination of ground water and surface waters, and endangerment to human health and the environment; and

f.      Migration of leachate containing hazardous constituents from the landfill into the adjacent Mangrove Lagoon, causing contamination of the sediments in the lagoon.

81.      The conditions described in Paragraph 80 may endanger human health and the environment, and were evidence that the past and present handling and disposal of solid and hazardous wastes at Bovoni may present an imminent and substantial endangerment to health and the environment.  Bovoni AOC, ¶¶ 28, 29.

82.      On June 30, 2000, the GVI entered into the Bovoni AOC (EPA Docket No. RCRA-02-2000-7302), which EPA issued pursuant to its authority under Section 7003(a) of RCRA, 42 U.S.C. § 6973(a).

83.      In the Bovoni AOC, the EPA Region 2 Administrator found, pursuant to Section 7003(a) of RCRA, 42 U.S.C. § 6973(a), that issuance of the Bovoni AOC was necessary to protect human health and the environment.

84.      In signing the Bovoni AOC, GVI expressly agreed that the AOC was accurate and reasonable, that it would undertake all actions required by the Bovoni AOC, and that it would

17

not contest EPA's jurisdiction to enforce or compel compliance with any term of the Bovoni

AOC.  Bovoni AOC, ¶¶ 88-90.

85.     Among other things, the Bovoni AOC, ¶¶ 40-44:

     a.     required GVI to implement a plan for managing lead acid batteries;

     b.     required GVI to install a fence to secure the landfill;

     c.     required GVI to implement a plan for excluding hazardous wastes from
incoming loads of solid waste;

     d.     required GVI to commence applying earthen cover to the operating face of
the landfill at the end of each operating day;

     e.     required GVI to develop a plan for complying with the federal municipal
solid waste criteria set forth in 40 C.F.R. Part 258 ("Bovoni Part 258 Plan"), including
measures for leachate collection and ground water monitoring, and a timetable for
implementing the Part 258 Plan; and

     f.     required GVI to implement the Bovoni Part 258 Plan according to its
timetable, once EPA had approved the Part 258 Plan and it had become final.

86.     The Bovoni AOC provides for stipulated penalties for violations of or

noncompliance with its requirements as follows: $100 for each day of each violation of the AOC

from the first through 30th day; $200 for each day of each  violation of the AOC from the 31st

through 90th day; and $500 for each day of each violation of the AOC after the 90th day.

87.     On April 18, 2002, GVI submitted a Part 258 Plan and schedule that, among other

things, provides for closing the existing substandard landfill, including installation of final cover,

installation of leachate and storm water control systems, and installation of ground water

monitoring wells.  Thereafter, through December 2004, GVI submitted additional compliance

schedules, each one reflecting delayed compliance with various landfill requirements.  In a

cooperative effort, EPA repeatedly waived or did not assess stipulated penalties for delayed

compliance with the Bovoni AOC and approved the revised compliance schedules for the performance of its requirements.

88.     On November 29, 2005, VIWMA submitted a timetable for implementing the Bovoni Part 258 Plan, which was approved by EPA on January 3, 2006.

89.     Under the EPA-approved November 2005 timetable, GVI was required to:

        a.      Publicly bid and award, by August 2006, a construction contract addressing the ground water monitoring system and the first stage of the storm water pollution prevention plan; and

        b.      Publicly bid and award, by June 2008, a second, long-term construction contract addressing landfill regrading, internal expansion, the balance of the storm water pollution prevention plan and landfill closure.

90.     The United States conducted discussions with GVI and VIWMA from 2006 through 2009 and during this time GVI and VIWMA developed plans and revised schedules regarding performance by GVI and VIWMA of measures to address their violations of law at Bovoni.

91.     As of April 8, 2010, the GVI and VIWMA have not awarded a construction contract addressing the ground water monitoring system.  They have not bid or awarded a contract for the first stage of the storm water pollution prevention plan.  They have not publicly bid or awarded the second construction contract, which is to address landfill regrading, internal expansion, the balance of the storm water pollution prevention plan and landfill closure.  On information and belief, at times during the period from June 2010 through August 2010, they did not apply earthen cover to the operating face of the landfill at the end of each operating day.

Non-Compliance with Anguilla RCRA AOC

92.     During the period from 1998 to 2001, EPA observed a number of improper waste management practices at Anguilla, including the following (Anguilla AOC, ¶¶ 10-17):

a.    Inadequate application of daily earthen cover on the operating face of the landfill, causing possible disease vectors, fires, odors, blowing litter, scavenging, rodent infestation, run-off, bird activity that created a risk to aircraft at the nearby Henry E. Rohlsen Airport, and other harmful effects;

b.    Subterranean and surface fires at the landfill;

c.    Inadequate security, creating a risk of improper disposal of hazardous wastes at the landfill;

d.    Inadequate inspection of incoming loads of solid waste for the presence of hazardous wastes, creating a risk that hazardous wastes could be disposed of at the landfill; and

e.    Disposal of used tires in a location inaccessible to emergency vehicles, creating a risk of fire.

93.    The conditions described in Paragraph 92, above, were evidence that the conditions at Anguilla presented an imminent and substantial endangerment to health and the environment.  Anguilla AOC, ¶ 18.

94.    As a result of these and other conditions at Anguilla, GVI and VIPA entered into the Anguilla AOC (EPA Docket No. RCRA-02-2001-7302), which EPA, on September 27, 2001, issued pursuant to its authority under Section 7003(a) of RCRA, 42 U.S.C. § 6973(a).

95.    In the Anguilla AOC, the EPA Region 2 Administrator found, pursuant to Section 7003(a) of RCRA, 42 U.S.C. § 6973(a), that issuance of the Anguilla AOC was necessary to protect human health and the environment.  Anguilla AOC ¶ 19.

96.    In signing the Anguilla AOC, GVI and VIPA expressly agreed that the AOC was accurate and reasonable, that it would undertake all actions required by the AOC, and that it would not contest EPA's jurisdiction to enforce or compel compliance with any term of the AOC.  Anguilla AOC, ¶¶ 73-75.

97.    Among other things, the Anguilla AOC (at ¶ 26):

     a.     required the GVI and VIPA ("Respondents") to develop a plan for complying with the federal municipal solid waste criteria set forth in 40 C.F.R. Part 258 ("Anguilla Part 258 Plan"), and a timetable for implementating the Part 258 Plan; and

     b.     required the Respondents to implement the Anguilla Part 258 Plan according to its timetable, once EPA has approved the Part 258 Plan and it has become final.

98.     The Anguilla AOC provides for stipulated penalties for violations of or noncompliance with its requirements as follows: $100 for each day of each violation of the AOC from the first through 30th day; $200 for each day of each violation of the AOC from the 31st through 90th day; and $500 for each day of each violation of the AOC after the 90th day. Anguilla AOC, ¶ 45.

99.     During the period from February 2003 through October 2009, VIWMA submitted additional compliance schedules, each one reflecting delayed compliance with key landfill requirements.  In a cooperative effort, EPA repeatedly waived or did not assess stipulated penalties for delayed performance with the Anguilla AOC, and until April 2006, approved the successive revised compliance schedules.

100.     VIWMA, on behalf of GVI, has submitted the following revised landfill compliance schedules for Anguilla:

     a.     In December 2004, a compliance schedule providing for: (i) submission, by May 2005, of plans for landfill closure and post-closure care; (ii) subsequent review and acceptance by EPA; and (iii) for public bid and award, within 120 days after plan acceptance by EPA, of a major construction contract for landfill closure.

     b.     In February and March 2006, a compliance schedule providing for submission of closure and post-closure plans by September 2006.

     c.     In February 2006, a compliance schedule providing for: (i) completion of construction of ground water and gas monitoring wells by July 2006; and (ii) completion of construction of a storm water and leachate control system, and performance of slope stabilization by August 2007.

d.      In October 2007, a compliance schedule providing for completion of landfill closure, with the exception of final cover, by December 2008.

e.      In August 2009, a compliance schedule providing for public bid and award, by November 2009, of a major construction contract for a solid waste transfer station, as an integral part of a landfill closure plan.

101.    Under the EPA-approved and final timetables, the Respondents were required to:

a.      Complete construction of ground water and gas monitoring wells by July 2006;

b.      Submit plans for landfill closure and post closure care by September 2006; and

c.      Complete construction of a storm water and leachate control system, and complete slope stabilization by August 2007.

Non-Compliance with Scrap Tire AOC

102.    GVI owns "Area A," an approximately two-acre area located approximately one quarter mile southeast of Bovoni.  Area A has been used for the handling and disposal of scrap tires (Scrap Tire AOC, ¶ 9).

103.    The scrap tire pile in Area A is situated in a steeply graded canyon (Scrap Tire AOC, ¶ 13).

104.    VIWMA has handled and/or disposed of scrap tires in Area A (Scrap Tire AOC, ¶ 11).

105.    The Hodges own "Area B," an approximately one-acre area located northwest and adjacent to Bovoni.  Area B has been used for the handling and disposal of scrap tires (Scrap Tire AOC, ¶ 11).

106.    The scrap tire pile in Area B is situated along a steeply graded hillside (Scrap Tire AOC, ¶ 14).

107.    There are eleven identified areas at and adjacent to Bovoni in which scrap tires have been disposed, which are referred to as the "Incidental Scrap Tire Areas."  Scrap Tire AOC, ¶ 15.

108.    During the period from 2005 to 2008, EPA observed a number of improper waste management practices in Area A, Area B, and the Incidental Scrap Tire Areas including the following:

        a.    The scrap tire pile in Area A did not not satisfy applicable fire safety standards and applicable disease vector control requirements, as it is located in a steeply graded canyon, it far exceeds allowable pile dimensions, and there is not: an approved water supply to put out fires, provisions to manage pyrolytic oil run-off in event of a fire, appropriate access roads, posted information signs, security fencing, or mosquito control measures (Scrap Tire AOC, ¶ 21); and

        b.    The scrap tire pile in Area B did not satisfy applicable fire safety standards and applicable disease vector control requirements, as it is located in a steeply graded hillside, it far exceeds allowable pile dimensions, and there is not: an approved water supply to put out fires, provisions to manage pyrolytic oil run-off in event of a fire, appropriate access roads, posted information signs, security fencing, or mosquito control measures (Scrap Tire AOC, ¶ 22).

109.    The past and present handling and disposal of scrap tires in Area A, Area B and the Incidental Scrap Tire Areas, including the conditions described in Paragraph 108, may present an imminent and substantial endangerment to health and the environment (Scrap Tire AOC, ¶ 32).

110.    On September 19, 2008, the GVI, VIWMA, the Hodges and A9 Trucking Enterprise, Inc. ("A9") entered into the Scrap Tire AOC (EPA Docket No. RCRA-02-2008-7307), which EPA issued pursuant to its authority under Section 7003(a) of RCRA, 42 U.S.C. § 6973(a).

111.    In the Scrap Tire AOC, the EPA Region 2 Administrator found, pursuant to Section 7003(a) of RCRA, 42 U.S.C. § 6973(a), that issuance of the Scrap Tire AOC was necessary to protect human health and the environment.  Scrap Tire AOC, ¶ 32.

112.    In signing the Scrap Tire AOC, the respondents to the AOC (*i.e.*, GVI, VIWMA, the Hodges and A9) expressly agreed that the AOC was accurate and reasonable, that they would undertake all actions required by the Scrap Tire AOC, and that they would not contest EPA's jurisdiction to enforce or compel compliance with any term of the Scrap Tire AOC.  Scrap Tire AOC, ¶ 63.

113.    Among other things, the Scrap Tire AOC:

        a.      requires VIWMA to remove, and transport off island for recycling or disposal after treatment, a total of 260,000 scrap tires from Area A in increments pursuant to a schedule requiring the final increment of scrap tires to be removed by July 31, 2010 (Scrap Tire AOC, ¶ 38(a), (d) and (g));

        b.      requires GVI to remove, and transport off island for recycling or disposal after treatment, a total of 260,000 scrap tires from Area A in increments pursuant to a schedule requiring the final increment of scrap tires to be removed by July 31, 2010 (Scrap Tire AOC, ¶ 38(a), (d) and (h));

        c.      Requires A9  to remove, and transport off island for recycling or disposal after treatment, a total of 255,000 scrap tires from Area A in increments pursuant to a schedule requiring the final increment of scrap tires to be removed by July 31, 2010 (Scrap Tire AOC, ¶ 38(a), (d) and (f));

        d.      requires the Hodges and A9 jointly and severally to remove, and transport off island for recycling or disposal after treatment, 100,000 scrap tires from Area B pursuant to a schedule requiring the final increment of tires to be removed by July 31, 2010 (Scrap Tire AOC, ¶ 39(a) and (d)); and

        e.      requires GVI and VIWMA to remove, and transport off island for recycling or disposal after treatment, all tires from the Incidental Scrap Tire Areas within 12 months (*i.e.*, by October 4, 2009) (Scrap Tire AOC, ¶ 40).

114.    In October 2009, EPA modified the schedule regarding A9's removal of scrap tires from Area A to provide, *inter alia*, for A9 to remove 80,000 tires by October 2009, to

remove the remaining tires in increments of 20,000 tires per each three-month period thereafter, and to remove all 255,000 of A9's share of tires by January 31, 2012.

115.    The Scrap Tire AOC provides for stipulated penalties for violations of or noncompliance with its requirements as follows:

> a.    $100 for each day of each violation of the AOC from the first through 30th day; $200 for each day of each violation of the AOC from the 31st through 60th day; $500 for each day of each violation of the AOC from the 61st through 120th day; and $2,000 for each day of each violation of the AOC after the 120th day (Scrap Tire AOC, ¶ 47);

> b.    for failures to comply with certain incremental deadlines for scrap tire removal, ten cents or 15 cents per tire of the shortfall (Scrap Tire AOC, ¶¶ 38(g), 38(h), 39(d));

> c.    for the failure to comply with the final deadlines for scrap tire removal from Areas A and B, $5,000 per month for the first two months, $10,000 per month for the third and fourth months, $15,000 per month for the fifth and sixth months, and $25,000 per month thereafter until all remaining scrap tires are removed (Scrap Tire AOC, ¶¶  (Scrap Tire AOC, ¶¶ 38(g), 38(h), 39(d)); and

> d.    for the failure to comply with the deadline for scrap tire removal from the Incidental Scrap Tire Area, $5,000 per month for each month until completion (Scrap Tire AOC, ¶ 40(b)).

116.    The GVI and VIWMA have not removed any scrap tires from Area A.

117.    On information and belief, A9 has removed 141,690 scrap tires from Area A as of October 21, 2010.

118.    The Hodges have not removed any scrap tires from Area B.

119.    On information and belief, A9 has removed a total of approximately 3,000 tires from Area B.  On information and belief, the Hodges have refused to allow A9 to have access to Area B, thus preventing A9 from removing any more scrap tires from Area B.

120.    During the period from May 2009 to the present, EPA sent numerous demands for stipulated penalties to GVI, VIWMA and the Hodges for their failures to comply with the Scrap

Tire AOC.  The GVI, VIWMA and the Hodges have not responded in any way to EPA's demands for stipulated penalties.

<u>FIRST CLAIM FOR RELIEF (BOVONI NMOC REPORTS)</u>

121.    Paragraphs 1 through 120 are realleged and incorporated herein by reference.

122.    The GVI failed to submit to the Administrator the annual NMOC reports for Bovoni due on April 6, 2001, April 6, 2002, and April 6, 2003, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT for those violations occurring on or after January 16, 2004.  *See* 40 C.F.R. § 63.1945(b).

123.    VIWMA failed to submit to the Administrator the annual NMOC reports for Bovoni due on April 6, 2005, April 6, 2006, April 6, 2008, and April 6, 2009, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

124.    On or about November 10, 2004, VIWMA submitted a late and inaccurate NMOC report for Bovoni to the Administrator, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

125.    The GVI failed to timely submit to the Administrator an accurate annual NMOC report for Bovoni on April 6, 2004, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

126.    On or about January 24, 2008, VIWMA submitted to the Administrator a late NMOC report for Bovoni, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

127. VIWMA failed to timely submit to the Administrator the annual NMOC report for Bovoni due on April 6, 2007, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

128. As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), GVI and VIWMA are liable for injunctive relief and/or civil penalties for the violations set forth above.

SECOND CLAIM FOR RELIEF (ANGUILLA NMOC REPORTS)

129. Paragraphs 1 through 128 are realleged and incorporated herein by reference.

130. The GVI failed to submit to the Administrator the annual NMOC reports for Anguilla due on April 6, 2001, April 6, 2002, April 6, 2003, and April 6, 2004, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT for those reports due on or after January 16, 2004. *See* 40 C.F.R. § 63.1945(b).

131. VIPA failed to submit to the Administrator the annual NMOC reports for Anguilla due on April 6, 2001, April 6, 2002, April 6, 2003, April 6, 2004, April 6, 2006, April 6, 2008, and April 6, 2009, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT for those reports due on or after January 16, 2004. *See* 40 C.F.R. § 63.1945(b).

132. VIWMA failed to submit to the Administrator the annual NMOC reports for Anguilla due on April 6, 2005, April 6, 2006, April 6, 2008, and April 6, 2009, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

133. On or about November 15, 2005, VIWMA submitted to the Administrator a late and inaccurate NMOC report for Anguilla, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

27

134.     VIPA and VIWMA failed to timely submit to the Administrator an accurate annual NMOC report for Anguilla on April 6, 2005, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

135.     On or about August 2, 2007, VIWMA submitted to the Administrator a late NMOC report for Anguilla, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

136.     VIPA and VIWMA failed to timely submit to the Administrator the annual NMOC report for Anguilla due on April 6, 2007, in violation of 40 C.F.R. § 62.14355(a) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

137.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), GVI, VIWMA and VIPA are liable for injunctive relief and/or a civil penalties for the violations set forth above.

### THIRD CLAIM FOR RELIEF (BOVONI GCCS)

138.     Paragraphs 1 through 137 are realleged and incorporated herein by reference.

139.     The GVI failed to submit to the Administrator a complete GCCS design plan for Bovoni from April 6, 2001 through approximately June 2004, in violation of 40 C.F.R. §§ 62.14356(a)(1) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT after January 16, 2004.  *See* 40 C.F.R. § 63.1945(b).

140.     VIWMA failed to submit to the Administrator a complete GCCS design plan for Bovoni from approximately June 2004 to March 5, 2008, in violation of 40 C.F.R. §§ 62.14356(a)(1) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

141.     The GVI failed to award contracts to initiate on-site construction or initiate on-site installation of a GCCS at Bovoni by December 6, 2001, in violation of 40 C.F.R.

§§ 62.14356(a)(2) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the
Landfill MACT after January 16, 2004. *See* 40 C.F.R. § 63.1945(b).

142.     VIWMA failed to award contracts to initiate on-site construction or initiate on-
site installation of a GCCS at Bovoni from June 2004 to the present, in violation of 40 C.F.R.
§§ 62.14356(a)(2) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the
Landfill MACT.

143.     The GVI failed to initiate on-site construction or initiate on-site installation of a
GCCS at Bovoni by April 6, 2002, in violation of 40 C.F.R. §§ 62.14356(a)(3) and (c)(1) of the
Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT after January 16,
2004. *See* 40 C.F.R. § 63.1945(b).

144.     VIWMA failed to initiate on-site construction or initiate on-site installation of a
GCCS at Bovoni from June 2004 to the present, in violation of 40 C.F.R. §§ 62.14356(a)(3) and
(c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

145.     The GVI failed to complete on-site construction or on-site installation of a GCCS
at Bovoni by October 6, 2002, in violation of 40 C.F.R. §§ 62.14356(a)(4) and (c)(1) of the
Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT after January 16,
2004. *See* 40 C.F.R. § 63.1945(b).

146.     VIWMA failed to complete on-site construction or on-site installation of a GCCS
at Bovoni from approximately June 2004 to the present, in violation of 40 C.F.R.
§§ 62.14356(a)(4) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the
Landfill MACT.

147.     The GVI failed to achieve final compliance by operating a GCCS at Bovoni as
specified in a final GCCS design plan by October 6, 2002, in violation of 40 C.F.R.

§§ 62.14356(a)(5) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT after January 16, 2004. *See* 40 C.F.R. § 63.1945(b).

148.     VIWMA failed to achieve final compliance by operating a GCCS at Bovoni as specified in a final GCCS design plan from June 2004 to the present, in violation of 40 C.F.R. §§ 62.14356(a)(5) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

149.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), GVI and VIWMA are liable for injunctive relief and/or a civil penalties for the violations set forth above.

### FOURTH CLAIM FOR RELIEF (ANGUILLA GCCS)

150.     Paragraphs 1 through 149 are realleged and incorporated herein by reference.

151.     The GVI failed to submit to the Administrator a complete GCCS design plan for Anguilla from April 6, 2001 through June 2004, in violation of 40 C.F.R. §§ 62.14356(a)(1) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT after January 16, 2004. *See* 40 C.F.R. § 63.1945(b).

152.     VIWMA failed to submit to the Administrator a complete GCCS design plan for Bovoni from June 2004 to March 5, 2008, in violation of 40 C.F.R. §§ 62.14356(a)(1) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

153.     The GVI failed to award contracts to initiate on-site construction or initiate on-site installation of a GCCS at Anguilla by December 6, 2001, in violation of 40 C.F.R. §§ 62.14356(a)(2) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT after January 16, 2004. *See* 40 C.F.R. § 63.1945(b).

154.     VIWMA failed to award contracts to initiate on-site construction or initiate on-site installation of a GCCS at Anguilla commencing in June 2004 to the present, in violation of

40 C.F.R. §§ 62.14356(a)(2) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R.

§ 63.1955 of the Landfill MACT.

155.     The GVI failed to initiate on-site construction or initiate on-site installation of a

GCCS at Anguilla by April 6, 2002, in violation of 40 C.F.R. §§ 62.14356(a)(3) and (c)(1) of the

Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT after January 16,

2004.  *See* 40 C.F.R. § 63.1945(b).

156.     VIWMA failed to initiate on-site construction or initiate on-site installation of a

GCCS at Anguilla from June 2004 to the present, in violation of 40 C.F.R. §§ 62.14356(a)(3)

and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

157.     The GVI failed to complete on-site construction or on-site installation of a GCCS

at Anguilla by October 6, 2002, in violation of 40 C.F.R. §§ 62.14356(a)(4) and (c)(1) of the

Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT after January 16,

2004.  *See* 40 C.F.R. § 63.1945(b).

158.     VIWMA failed to complete on-site construction or on-site installation of a GCCS

at Anguilla from June 2004 to the present, in violation of 40 C.F.R. §§ 62.14356(a)(4) and (c)(1)

of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

159.     The GVI failed to achieve final compliance by operating a GCCS at Anguilla as

specified in the final GCCS design plan by October 6, 2002, in violation of 40 C.F.R.

§§ 62.14356(a)(5) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the

Landfill MACT after January 16, 2004.  *See* 40 C.F.R. § 63.1945(b).

160.     VIWMA failed to achieve final compliance by operating a GCCS at Anguilla as

specified in the final GCCS design plan from June 2004 to the present, in violation of 40 C.F.R.

§§ 62.14356(a)(5) and (c)(1) of the Federal Plan, and in violation of 40 C.F.R. § 63.1955 of the Landfill MACT.

161.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), GVI, VIWMA and VIPA are liable for injunctive relief and/or civil penalties for the violations set forth above.

FIFTH CLAIM FOR RELIEF (SSM PLANS)

162.    Paragraphs 1 through 161 are realleged and incorporated herein by reference.

163.    The GVI and VIWMA failed to develop and implement an SSM plan for Bovoni, in violation of 40 C.F.R. § 63.1960 of the Landfill MACT and 40 C.F.R. § 63.6(e)(3) of the Federal Plan.

164.    The GVI, VIWMA and VIPA failed to develop and implement an SSM plan for Anguilla, in violation of 40 C.F.R. § 63.1960 of the Landfill MACT and 40 C.F.R. § 63.6(e)(3) of the Federal Plan.

165.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), GVI, VIWMA and VIPA are liable for injunctive relief and/or civil penalties for these violations.

SIXTH CLAIM FOR RELIEF: NON-COMPLIANCE WITH BOVONI AOC

166.    Paragraphs 1 through 165 are realleged and incorporated herein by reference.

167.    The GVI has complied with some provisions of the Bovoni AOC and the Bovoni Part 258 Plan.  However, it has not performed a number of important actions which are required by the Bovoni Part 258 Plan, and which are needed to remedy the conditions described in the Bovoni AOC and needed to bring Bovoni into compliance with regulatory requirements.

168.    GVI has failed to comply with the EPA-approved Bovoni Part 258 Plan, as follows:

a.      While it has publicly bid the construction contract for the ground water monitoring system and the first stage of the storm water pollution prevention plan, it has not yet awarded the contract;

b.      It has not yet publicly bid or awarded the long-term construction contract addressing landfill regrading, internal expansion, the balance of the the storm water pollution prevention system, and landfill closure; and

c.      At times it has not applied earthen cover to the operating face of the landfill at the end of each operating day.

169.    Each failure to comply with the EPA-approved Bovoni Part 258 Plan is a failure to comply with the Bovoni AOC, and each failure to comply with the Bovoni AOC is a violation of Section 7003(b) of RCRA, 42 U.S.C. § 6973(b).

170.    Pursuant to the Bovoni AOC, the GVI is liable for stipulated penalties for each day of each failure to comply with the requirements of that AOC, including the Bovoni Part 258 Plan and its timetable, and is liable for injunctive relief.

SEVENTH CLAIM FOR RELIEF: NON-COMPLIANCE WITH ANGUILLA AOC

171.    Paragraphs 1 through 170 are realleged and incorporated herein by reference.

172.    The GVI and VIPA have not awarded any construction contracts for Anguilla for the ground water and gas monitoring wells, for the storm water and leachate control system, and regrading for landfill closure.

173.    The GVI and VIPA have failed to comply with the EPA-approved Anguilla Part 258 Plan and its compliance timetables, as follows:

a.      They have not completed construction of the ground water and gas monitoring wells.

b.      They have not completed construction of the storm water and leachate control system, or completed slope stabilization.

c.      While they have submitted draft closure design plans and specifications, they have not submitted final plans for landfill closure and post-closure care for Anguilla.

33

174.    Each failure to comply with the EPA-approved Anguilla Part 258 Plan and its compliance timetables is a failure to comply with the Anguilla AOC, and each failure to comply with the Anguilla AOC is a violation of Section 7003(b) of RCRA, 42 U.S.C. § 6973(b).

175.    Pursuant to the Anguilla AOC, the GVI and VIPA are liable for stipulated penalties for each day of each failure to comply with the requirments of that AOC, including the Anguilla Part 258 Plan and its timetables, and is liable for injunctive relief.

EIGHTH CLAIM FOR RELIEF: NON-COMPLIANCE WITH SCRAP TIRE AOC

176.    Paragraphs 1 through 175 are realleged and incorporated herein by reference.

177.    The GVI has failed to comply with the Scrap Tire AOC by, among other things, failing to remove any scrap tires from Area A and failing to remove any scrap tires from the Incidental Scrap Tire Areas.

178.    VIWMA has failed to comply with the Scrap Tire AOC by, among other things, failing to remove any scrap tires from Area A and failing to remove any scrap tires from the Incidental Scrap Tire Areas.

179.    The Hodges have failed to comply with the Scrap Tire AOC by, among other things, failing to remove any scrap tires from Area B.

180.    Pursuant to the Scrap Tire AOC, the GVI, VIWMA and the Hodges are liable for stipulated penalties for their failures to comply with the requirements of the Scrap Tire AOC, and they are liable for injunctive relief.

REQUEST FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully requests that this Court:

For Bovoni:

34

1.      Order GVI and VIWMA to pay civil penalties of up to $27,500 per day for each violation of the Clean Air CAA and the applicable regulations from April 6, 2001 to March 15, 2004; up to $32,500 per day for each such violation from March 15, 2004 to January 12, 2009; and up to $37,500 per day for each such violation after January 12, 2009.

2.      Order GVI and VIWMA to achieve and maintain compliance with the Federal Plan and the Landfill MACT by ordering GVI and VIWMA to:

a.      award a construction contract for installation of a GCCS at Bovoni;

b.      initiate on-site construction or initiate on-site installation of a GCCS at Bovoni,

c.      complete on-site construction or installation of a GCCS at Bovoni;

d.      achieve final compliance by operating a GCCS as specified in the final GCCS design plan at Bovoni; and

e.      develop and implement an SSM plan for Bovoni.

3.      Enjoin GVI and VIWMA from operating Bovoni in violation of the Federal Plan and the Landfill MACT.

4.      Order GVI to pay stipulated penalties as provided under the Bovoni AOC.

5.      Order GVI to comply with the Bovoni AOC, including the Bovoni Part 258 Plan.

For Anguilla:

6.      Order GVI, VIWMA and VIPA to pay civil penalties of up to $27,500 per day for each violation of the Clean Air CAA and the applicable regulations from April 6, 2001 to March 15, 2004; up to $32,500 per day for each such violation from March 15, 2004 to January12, 2009; and up to $37,500 per day for each such violation after January 12, 2009.

7.      Order GVI, VIWMA and VIPA to achieve and maintain compliance with the Federal Plan, and the Landfill MACT by ordering GVI, VIWMA and VIPA to:

a.      submit a complete GCCS design plan for Anguilla;

b.      award contracts to initiate on-site construction or initiate on-site installation of a GCCS at Anguilla;

c.      initiate on-site construction or initiate on-site installation of a GCCS at Anguilla,

d.      complete on-site construction or installation of a GCCS at Anguilla;

e.      achieve final compliance by operating a GCCS as specified in the final GCCS design plan at Anguilla; and

f.      develop and implement an SSM plan for Anguilla.

8.      Enjoin GVI, VIWMA and VIPA from operating Anguilla in violation of the Federal Plan, and the Landfill MACT.

9.      Order GVI and VIPA to pay stipulated penalties as provided under the Anguilla AOC.

10.      Order GVI and VIPA to comply with the Anguilla AOC, including the Anguilla Part 258 Plan.

For the Scrap Tires:

11.      Order GVI, VIWMA and the Hodges to pay stipulated penalties as provided under the Scrap Tire AOC.

12.      Order GVI, VIWMA, and the Hodges to comply with the Scrap Tire AOC.

For Anguilla, Bovoni and the Scrap Tires:

13.      Award the United States its costs of this action; and

14.      Grant the United States such other and further relief as the Court deems just and proper.

Respectfully Submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


_____/s/ Mark Gallagher_____
MARK A. GALLAGHER
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
phone: 202-514-5405
fax: 202-616-2427
(email) mark.gallagher1@usdoj.gov


RONALD W. SHARPE
United States Attorney
District of the Virgin Islands

JOYCELYN HEWLETT
Assistant United States Attorney
District of the Virgin Islands
Federal Building and U.S. Courthouse
5500 Veterans Drive, Room 260
St. Thomas, Virgin Islands 00802
(340) 774-5757
(email) joycelyn.hewlett@usdoj.gov

OF COUNSEL:

ROBERT HAZEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, NY  10007-1866

LILIANA VILLATORA
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, NY  10007-1866

FLAIRE H. MILLS
Chief, Air Branch
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, NY  10007-1866